STATE of Tennessee, Appellee,

v.

Kevin BURNS, Appellant.

Supreme Court of Tennessee,
at Jackson.

Nov. 9, 1998.

Glenn I. Wright, Wilson & Wright, Memphis, for Appellant.

John Knox Walkup, Attorney General & Reporter, Michael E. Moore, Solicitor General, Kenneth W. Rucker, Assistant Attorney General, Nashville, At Trial: John W. Pierotti, District Attorney General, Thomas D. Henderson, John Wheeler Campbell, Assistant District Attorney Generals, Memphis, for Appellee.

## OPINION

ANDERSON, Chief Justice.

The defendant, Kevin Burns, was convicted of two counts of felony murder and two counts of attempted felony murder. The jury imposed the death penalty for one of the felony murder convictions after finding that evidence of an aggravating factor—that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered—outweighed the evidence of mitigating factors beyond a reasonable doubt. The jury imposed a life sentence for the other felony murder conviction.

On direct appeal, the Court of Criminal Appeals affirmed the convictions and the sentences for the felony murder convictions, but reversed the attempted felony murder convictions. After the case was docketed as a death penalty appeal in this Court pursuant to Tenn.Code Ann. § 39–13–206(a)(1) (1997), we reviewed the Court of Criminal Appeals' decision, the record, and the applicable law,

and we entered an order specifying three issues for oral argument.[1]

We have determined that none of the alleged errors claimed by the defendant affected the convictions for felony murder or the sentences imposed by the jury. We have further concluded that the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and this defendant. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

## BACKGROUND

### Guilt Phase

On April 20, 1992, four young men, Damond Dawson, Tracey Johnson, Eric Thomas, and Tommie Blackman, were sitting in a car in Dawson's driveway in Memphis. Dawson was in the driver's seat, Johnson was in the front passenger seat, Thomas was in the back seat behind Dawson, and Blackman was in the back seat behind Johnson.

The defendant, Kevin Burns, and Carlito Adams, who knew Blackman, walked up to the passenger side of the car. Adams pulled out a handgun and told Blackman to get out of the car. When Blackman refused, Burns pulled out a handgun and went around to the driver's side of the car. Blackman got out of the car and fled. Adams said "get him," and three or four more men appeared from behind hedges and fired at Blackman.

Eric Jones, age fourteen, was playing basketball at Dawson's house with three friends. Jones saw the men in the car removing jewelry and pulling money from their pockets. Seconds later, Jones saw Blackman running toward him. Amidst gunshots, Jones and Blackman escaped to the back of the house; Jones' three friends ran to an adjacent yard. Once inside the house, Jones heard seven or eight more gunshots.

Mary Jones, Eric Jones' mother, lived across the street from the Dawsons. She saw Adams shoot Johnson once in the chest.

She saw Kevin Burns shoot Dawson several times, walk to the front of the car, and then shoot Dawson again. Ms. Jones unequivocally identified Burns and stated that she got "a real good look in his face" as he ran toward her after the shootings.

Tracey Johnson died at the scene. Damond Dawson, who suffered five gunshots to his arm, buttocks, chest, and hip was alive when police arrived but died after being transported to the hospital. Eric Thomas, who sustained gunshots to his chest and stomach, survived and made a photo identification of Kevin Burns two days after the incident. Thomas testified that Burns and the others had "opened fire" after robbing him and his friends of their jewelry and money. Thomas said that he initially told police he had been shot by Adams, but explained that he believed he was going to die and gave police the only name he knew, which was Adams.

On June 23, 1992, Burns was found in Chicago and arrested. After being advised of his rights and signing a waiver, the defendant gave a statement in which he admitted his role in the killings. He said that he had received a telephone call from Kevin Shaw, who told him that four men had "jumped" Shaw's cousin. Burns, Shaw, and four others intended to fight the four men, and Shaw gave Burns a .32 caliber handgun. As the others approached a car with four men sitting in it, Burns stayed behind. He heard a shot, saw a man running across the yard, and fired three shots. He then left the scene with the other men.

After the guilt phase of the trial, the jury deliberated and returned verdicts of guilty for two counts of felony murder and two counts of attempted felony murder. The trial moved into the penalty phase of the proceedings for the jury to determine the punishment for each of the felony murder convictions.

### Penalty Phase

Jonnie Dawson, mother of Damond Dawson, testified that Damond was the youngest

---

1. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup.Ct. R. 12.

of her three children and seventeen years of age when he was killed. She said he was a good son who was very good at athletics. The neighborhood had changed after the killings; people locked their doors and were afraid. Ms. Dawson testified that she no longer knew what it was like to be happy.

Brenda Hudson, mother of Tracey Johnson, testified that Tracey was the oldest of her three children and twenty years of age when he was killed. He had been working at Wal–Mart and saving money for his four-month-old daughter. Tracey's death had greatly affected Ms. Hudson' other two children, Tracey's grandfather, and Tracey's young daughter:

> When you go over to her house to see her, she has a picture in a frame and she will show you. She'll say, 'this is my father—this is my daddy, Tracey. He lives in God's house up in heaven.' And it's hard for me to go see her a lot because it breaks my heart to hear her say that.

In mitigation, Leslie Burns, the defendant's mother, testified that the defendant was twenty-six years of age and had twelve brothers and sisters. He had graduated from high school and had presented no disciplinary problems while in school. The defendant's father, Reverend Obra Carter, testified that his son had always been obedient and well-mannered. Phillip Carter, the defendant's brother, testified that the defendant had been active in the church and had always tried to avoid trouble.

Norman McDonald, the defendant's Sunday School teacher, testified that he had known Kevin Burns for several years. According to McDonald, Burns was a "faithful" young man who had always attended church regularly. Mary Wilson, a Captain with the Shelby County Sheriff's Department, and Bennet Dean, a volunteer chaplain, both testified that Burns had actively participated in religious services while in custody for these offenses.

The prosecution relied on two aggravating circumstances to seek the death penalty for

the felony murder convictions—that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder, and that the murder had been committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn.Code Ann. § 39–13–204(i)(3) and (6) (1997 & Supp.1998).

With regard to the felony murder of Damond Dawson, the jury imposed the death penalty after finding that the evidence supported the "great risk of death" aggravating circumstance and that this factor outweighed the evidence of mitigating factors beyond a reasonable doubt. With regard to the felony murder of Tracey Johnson, the jury imposed a sentence of life imprisonment.

The trial court entered judgment in accordance with the jury's verdict. The Court of Criminal Appeals affirmed the convictions and sentences for the offenses of felony murder, but reversed the convictions for attempted felony murder based on our opinion in *State v. Kimbrough*, 924 S.W.2d 888 (Tenn. 1996).[2] After our review of the record and applicable authority, we affirm the Court of Criminal Appeals.

### AGGRAVATING CIRCUMSTANCE

■ The defendant argues that the Court of Criminal Appeals' reversal of the attempted felony murder convictions requires a finding that the evidence failed to support the single aggravating circumstance found by the jury—that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered. Tenn.Code Ann. § 39–13–204(i)(3). The State maintains that the evidence overwhelmingly supported the jury's finding, notwithstanding the reversal of the attempted felony murders.

We begin by observing that the Court of Criminal Appeals properly reversed the attempted felony convictions. In *Kimbrough, supra,* we noted that the statutes governing attempted crimes require a defendant to *intend* the commission of a specific crime or result, while the offense of felony murder

---

**2.** The Court of Criminal Appeals remanded the cases to the trial court for possible retrial for

attempted premeditated murder.

requires "a *reckless* killing of another" in the course of certain enumerated felonies. Tenn. Code Ann. §§ 39–12–101 (1997) & 39–13–202(a)(2) (1997 & Supp.1998). Like nearly every jurisdiction that has addressed the issue, we concluded that the offense of attempted felony murder does not exist:

[I]t is illogical that someone could intend to cause someone else's death through negligence or even recklessness. While one may reasonably conclude that a defendant intentionally behaved in a reckless manner and may have intended to kill the victim, it does not make sense to say that a defendant intended to kill the victim by being reckless.

We conclude that one cannot intend to accomplish the unintended. Consequently, the offense of attempted felony-murder does not exist in Tennessee.

*Kimbrough,* 924 S.W.2d at 892.

Aggravating circumstance (i)(3) "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." *State v. Cone,* 665 S.W.2d 87, 95 (Tenn.), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 357 (1984). It most often has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present. *State v. McKay,* 680 S.W.2d 447 (Tenn.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1412, 84 L.Ed.2d 795 (1985) (defendants killed two victims during robbery and shot at and threatened two other persons inside store); *State v. Workman,* 667 S.W.2d 44 (Tenn.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984) (during a shoot out with police, the defendant killed one officer, wounded a second, and narrowly missed a third); *State v. Johnson,* 632 S.W.2d 542 (Tenn.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 183, 74 L.Ed.2d 148 (1982) (three shot and injured inside store; two shot and killed in the parking lot as defendant fled).

The defendant's argument is that the prosecution relied upon the attempted felony murder convictions to establish this aggravating circumstance, and that the reversal of the convictions renders the aggravating circumstance inapplicable. The defendant cites the following excerpts from the prosecutor's closing argument:

We haven't proven a risk of death to two or more people? My God, you've returned a verdict that he attempted to murder two other people. It is established, beyond a reasonable doubt, and already been found as a verdict that there was a risk of death to two or more people.

. . . .

So, how anybody can say those [the aggravators] weren't proven when the verdict proves one of them and going back and shooting him again proves the other.

. . . .

If you look at the evidence, you know the aggravating circumstances are there, and one of them has already been found.

The transcript reveals, however, that the above statements were made in the context of the prosecution's detailed argument as to the evidence which supported this aggravating circumstance. In its initial argument, for example, the prosecutor said:

Now, what we're talking about is when Mr. Blackman was running from the car, Eric Jones was in the way of the shooting. Eric Jones confronted Tommie Blackman as he ran from the car and was caught in this gunfire.... But also there were three other young men playing basketball on the side of the yard. All three of those young men were also caught in the gunfire of the individual shooting at Tommie Blackman. That is risk of death or great bodily injury to persons other than the intended victims in this case.... In addition to Tommie Blackman, there were four persons that were in the line of fire. That is one of the aggravating factors....

These points were reiterated in the prosecutor's rebuttal argument as well:

There wasn't a risk of death to two or more people. How about ... Eric Thomas who caught three rounds in his body fired not by one of [the] codefendants but by that man [defendant] right there. He shot

him and shot him and shot him. That's a pretty good risk of death. How about Tommie Blackman who's running? There's a risk of death to two people right there, not even counting the children playing basketball.

. . . .

He went with other armed men. He robbed. He shot and wounded an unarmed teenager. He helped others shoot at and kill other unarmed teenagers. With others, he shot in the direction of children playing basketball; and he personally shot two people repeatedly.

Of even greater significance, however, is that the evidence in this record overwhelmingly supports the prosecutor's argument and the jury's finding that the defendant knowingly created a great risk of death to two or more persons other than the victims murdered. The defendant, while armed and acting in concert with others, approached a car containing four unarmed men. The defendant fired his weapon inside the car where Dawson, Johnson, and Thomas were seated, killing Dawson and wounding Thomas. He admitted firing shots at the fleeing Blackman, which, according to testimony, directly imperiled Eric Jones and the three individuals who were playing basketball in the Dawson's driveway.

Accordingly, the evidence overwhelmingly supports the prosecutor's argument and the jury's finding that the defendant knowingly created a great risk of death to two or more persons other than the victim during the act or murder. The reversal of the attempted felony murder convictions, which under *Kimbrough* was predicated upon a matter of statutory law, does not affect the jury's finding regarding the aggravating circumstance.

### VICTIM IMPACT EVIDENCE

The defendant argues that the trial court erred in admitting testimony of the victims' mothers during the penalty phase of the trial and by allowing the prosecutor to emphasize this evidence during its closing argument. The defendant contends that so-called "victim impact" evidence and argument is inflam- matory, irrelevant to the sentencing determination in a capital proceeding, inadmissible under our death penalty statutes, and violative of Article I, §§ 8 and 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the United States Constitution. The State maintains that the evidence is relevant and admissible in the penalty phase of a capital trial.

■ In *State v. Nesbit*, 978 S.W.2d 872 (Tenn.1998), we recently held that victim impact evidence and argument is not *per se* improper under either statutory or constitutional law. Our analysis of the sentencing statutes began with Tenn.Code Ann. § 39–13–204(c), which states:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, *the nature and circumstances of the crime;* the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. *Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence;* provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

(emphasis added).

This statute delineates a procedure which enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. As we said in *Nesbit*, "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language 'nature and circumstances of the crime.'" 978 S.W.2d at 889. The statute, therefore, allows the sentencing jury to be

reminded that "just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).[3]

We also, in *Nesbit,* recognized that the United States Supreme Court has held that Eighth Amendment to the United States Constitution does not constitute a *per se* bar to the admission of victim impact evidence and argument:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.

Nesbit, 978 S.W.2d at 889 (quoting *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608). Our recent decisions have followed *Payne* and have held that victim impact evidence and argument is likewise not precluded by the Tennessee Constitution. *E.g., Nesbit,* 978 S.W.2d at 889.

■ Not all victim impact evidence and argument, however, is appropriate. It should be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's family." *Id.* at 891 (citing, *Payne,* 501 U.S. at 822, 111 S.Ct. at 2607) (footnote omitted).

■ Moreover, any evidence that threatens to render the trial fundamentally unfair or poses a risk of unfair prejudice may violate the due process provisions of the United States and Tennessee Constitutions and must be excluded. *Id.* The trial court

should also exclude any evidence where its probative value is substantially outweighed by its unfair prejudice. Tenn. R. Evid. 403. Finally, the prosecutor and the trial court should ensure that the prosecution's argument is restrained and reasoned, fairly based on the evidence, and not merely an appeal to the bias or emotional responses of the jury. *Nesbit,* 978 S.W.2d at 891.

■ Here, the victims' mothers testified during the penalty phase. Each related a few details about their deceased sons. Ms. Dawson testified that the shootings had a negative effect on her own life: she had divorced, moved to another house, and no longer knew what it was like to feel happy. Johnson's mother, Ms. Hudson, testified that "it had been hard to let go" of the killings, and she cried every day. She also testified that the killing affected her other two children, her father, and the victim's young daughter.

Although evidence regarding the emotional impact of the murder "should be most closely scrutinized," *Nesbit,* 978 S.W.2d at 891, nearly all of this evidence was limited in scope to a glimpse into the lives of Dawson and Johnson and the effects of the killings on their immediate families. This testimony was reserved in nature and not inflammatory, and its admission was not barred by the capital sentencing statutes or the Constitutions of the United States and Tennessee. Moreover, the prosecutor did not extensively discuss or emphasize this evidence in summation. Accordingly, neither the admission of this evidence nor the prosecution's argument was improper.

■ Ms. Dawson also testified, however, that the killings had adversely affected the entire community—for instance, people were afraid and kept their doors locked. The prosecutor emphasized this testimony during closing:

> Do you remember the testimony of Miss Dawson? Stay home. Get back over here on David Street. Stay in your own drive-

---

**3.** In *Nesbit,* we also observed that *Cozzolino v. State,* 584 S.W.2d 765 (Tenn.1979), in which this Court had said that evidence must be relevant to an aggravating circumstance or mitigating circumstance, had not been applied so as to preclude evidence that is relevant to the "nature and circumstances of the offense." 978 S.W.2d at 889. We also note that the legislature has since enacted 1998 Pub. Acts, ch. 916, which expressly allows the State to introduce victim impact evidence and argument. This provision became effective July 1, 1998.

way. Stay in your own yard. You'll be safe there. I never thought anybody would come up in the yard. It reminds me of the old anonymous African proverb: It takes a whole village to raise a child. And that's what this village was. That's what David street was. This wasn't a street. You've heard it described here. This is the neighborhood we all wish America really had. And that was part of the impact evidence in this case. They didn't just kill a couple of more Memphis teenagers and try to kill a couple more. They killed an entire village. They killed an entire neighborhood. They destroyed the very backbone of this community when they do things like that. . . .

. . . .

You've heard what it did to this part of Orange Mound—not just to families and not just to individuals, but what it did to Orange Mound.

This evidence and argument went beyond "information designed to show those unique characteristics which provide a glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon *member's of the victim's family.*" *Nesbit,* 978 S.W.2d at 891 (footnote omitted)(emphasis added). The testimony was not objected to by the defendant, however, and the prosecutor's argument was based on this evidence. Although beyond the scope of *Nesbit,* neither the evidence nor the argument was inflammatory, and it did not render the proceedings fundamentally unfair or unduly prejudicial to the defendant. *See Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Thus, we conclude the defendant is not entitled to relief on this issue.

## PROPORTIONALITY

■ A comparative proportionality review must be undertaken in capital cases pursuant to Tenn.Code Ann. § 39–13–206(c)(1) (1997). The analysis is designed to identify aberrant, arbitrary or capricious sentences by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *State v. Bland,* 958 S.W.2d 651, 662 (Tenn.1997) (quoting, *Pulley v. Harris,* 465 U.S. 37, 42, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. *Bland,* 958 S.W.2d at 668.

■ As we discussed in *Bland,* we have consistently employed the precedent seeking method of comparative proportionality review, which compares the case at issue with other cases in which defendants were convicted of the same or similar crimes. Since no crimes are precisely alike, the precedent seeking method of review is not a rigid, mechanical formula. Instead we consider numerous factors regarding the offense itself: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victims' age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Id.* at 667. We also consider numerous factors about the defendant: (1) age, race and gender; (2) prior criminal record; (3) mental, emotional, or physical condition; (4) role in the murder; (5) remorse; (6) cooperation with authorities; (7) the defendant's knowledge of a victim's helplessness; and (8) the defendant's potential for rehabilitation. *Id.*

■ Here, the defendant shot the victim Dawson, walked around the side of the car, and then returned to shoot Dawson again. Acting in concert with others, the defendant shot and killed Dawson, shot and wounded Thomas, and shot at the fleeing Blackman. One apparent motivation for the killing was robbery; another, offered in the defendant's own statement, was to assist in a revenge scheme. There was no evidence to suggest the defendant was provoked or justified in his actions. The defendant's main argument with regard to the nature of the offense is that he did not know that the victims were unarmed.

The defendant was twenty-three years of age when the offense was committed. He

had prior criminal convictions for burglary and theft. There is no evidence that he suffered from any emotional, mental, or physical conditions. There is no evidence that the defendant showed remorse for these crimes or that he assisted the authorities; indeed, the proof shows that the defendant fled to Chicago after committing these crimes. The defendant played a major role in the commission of the crimes, killing Dawson, wounding Thomas, and firing at Blackman. There is extensive evidence of the defendant's religious faith and activities both before and after the offenses, but no other evidence as to his rehabilitative potential.

Our review reveals numerous cases similar to this one in which the death penalty was upheld. In *Bland, supra,* the defendant was convicted of premeditated murder for shooting an unresisting victim. As in this case, Bland and several co-defendants had planned to rob the victims. When one of the victims tried to flee, Bland shot him in the leg, pursued him a considerable distance, and then shot him several more times as the victim tried to hide under a truck. In addition to the similarities in how the killings occurred, Bland, age nineteen, was the same approximate age as Burns, and he had no prior adult criminal record. Also like the present case, only a single aggravating circumstance found by the jury—that the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39–13–204(i)(5).

In *State v. Van Tran,* 864 S.W.2d 465 (Tenn.1993), the defendant killed a seventy-four-year-old victim in the course of a robbery. The victim had been shot once and was lying on the floor when the defendant shot her in the head. The defendant was age nineteen and had no prior record. Mitigating evidence included the defendant's good work record, cooperation with law enforcement, remorse, and educational problems. The jury imposed the death sentence after finding only one aggravating circumstance— that the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39–13–204(i)(5).

In *State v. McKay,* 680 S.W.2d 447 (Tenn. 1984), co-defendants McKay and Sample were convicted of two counts of felony murder for shooting to death two store clerks in the course of a robbery. The defendants and victims were the same race, gender and approximate age. For Sample, the jury found three aggravating circumstances: great risk of death to two or more persons, murder was committed to prevent prosecution, and the killing occurred in the perpetration of a felony. Tenn.Code Ann. § 39–2–203(i)(3), (6), and (7) (1982) [now Tenn.Code Ann. § 39–13–204(i)(3), (6), and (7)]. McKay had these same aggravators in addition to a prior conviction for a violent felony. Tenn.Code Ann. § 39–2–203(i)(2) (1982) [now Tenn.Code Ann. § 39–13–204(i)(2)]. *See also State v. Johnson,* 632 S.W.2d 542 (Tenn.1982) (defendant and co-defendant shot three people during a robbery and shot and killed two people in the parking lot).

In *State v. King,* 694 S.W.2d 941 (Tenn. 1985), the defendant and a codefendant entered a tavern, fired a shot into the ceiling and ordered everyone to lie on the floor. After robbing each individual and taking money from the cash register, the defendant shot and killed the owner of the tavern. The defendant was convicted of felony murder and was sentenced to death based upon three aggravating circumstances: previous convictions for violent felonies; risk of death to two or more persons; and felony murder. Tenn. Code Ann. § 39–2–203(i)(2), (3), and (7) (1982) [now Tenn.Code Ann. § 39–13–204(i)(2), (3), and (7)].

In *State v. Hurley,* 876 S.W.2d 57 (Tenn. 1993), *cert. denied,* 513 U.S. 933, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994), the defendant killed the victim by shooting him once in the head. The jury found the defendant guilty of premeditated murder and imposed the sentence of death upon finding that the murder was committed while the defendant was engaged in committing a felony—robbery. Tenn.Code Ann. § 39–2–203(i)(7) (1982) [now Tenn.Code Ann. § 39–13–204(i)(7)].

In *State v. Cooper,* 718 S.W.2d 256 (Tenn. 1986), *cert. denied* 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987), the thirty-three-year-old defendant shot his estranged wife

four times while she was trapped inside a cashier's booth. After shooting the victim once, he walked away, then turned back and resumed firing at her. The jury imposed the death penalty, as in this case, upon finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39–2–203(i)(5) (1982) [now Tenn.Code Ann. § 39–13–204(i)(5) ].

These cases, although not identical, contain numerous similarities to both the offense and the defendant before us. In each case, the defendant shot and killed unarmed victims, with robbery being the apparent motive. In four of the cases, *Bland, Van Tran, Hurley,* and *Cooper,* the death penalty was imposed based upon a single aggravating circumstance found by the jury. In two of the cases, *King* and *McKay,* one of the aggravating circumstances was, as in this case, that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered. In two of the cases, *Bland* and *Van Tran,* mitigating circumstances included the youth of the offender and their minimal criminal records as adults. In all of these cases, this Court upheld the death penalty after finding that it was neither arbitrary nor disproportionate.

The defendant argues that unlike the defendants in these prior cases, he did not know that the victims were unarmed. He argues that the case is similar to *State v. Jack Jay North,* No. 02C01–9512–CC–00369, 1996 WL 711473 (Tenn.Crim.App., Jackson, Dec. 12, 1996), and *State v. Horace Jones,* No. 117 (Tenn.Crim.App., Jackson, Dec. 4, 1980)—first-degree murder cases in which the defendants received sentences of life imprisonment.

In *North,* the defendant and a co-defendant entered the victim's home and shot the victim several times with a shotgun. The evidence showed that the killing was committed for the defendants to prove their worthiness to other members of a gang. In mitigation, North was only twenty years of age, had received a G.E.D, did not have a lengthy prior criminal record, and testified in a "tearful, emotional manner." The jury found three aggravating circumstances were proven but returned a verdict of life imprisonment.

In *Jones,* the defendant shot the victim several times in a pool hall. After the gun misfired and the defendant stopped to reload, the victim attempted to flee and was shot and killed. The defendant, who was twenty-four, was apprehended and arrested one month later. There was extensive mitigating evidence including the defendant's rehabilitative potential, extreme emotional disturbance, and threatening actions by the victim. The jury returned a life sentence for the offense.

Although not cited by the defendant or the State, we observe that the present case bears obvious similarities to Burns' co-defendants, Carlito Adams and Derrick Garrin, who were tried separately and received life sentences. Garrin had given a statement admitting he was present at the scene and fired shots at Blackman; but, he denied firing shots inside the car. *State v. Derrick K. Garrin,* No. 02C01–9501–CR–00028, 1996 WL 275034 (Tenn.Crim.App., Jackson, May 24, 1996). Adams testified that he and Blackman had a prior altercation in which Blackman pulled a gun. He admitted being at the scene but denied shooting anyone. In the sentencing phase, his family members and other witnesses testified about his employment history, character, and rehabilitative potential. His family members asked the jury to spare his life. *State v. Carlito Adams,* No. 02C01–9608–CR–00267 (Tenn.Crim.App., Jackson, Dec. 11, 1997).

Despite these similarities to the present case, our function is not to invalidate a death sentence merely because the circumstances of the offense are similar to those in which another defendant or even a co-defendant received a life sentence. *See State v. Cauthern,* 967 S.W.2d 726 (Tenn.1998) (defendant's death sentence not disproportionate merely because co-defendant received life sentence). Instead, we must review factors about the crimes and the defendant and, in comparing these factors with prior cases, determine whether the case plainly lacks circumstances found in similar cases in which the defendant received the death penalty. *Bland,* 958 S.W.2d at 665. Our review in this case reveals numerous comparable cases in which the death penalty was upheld. Thus, we conclude that the death sentence was not disproportionate or arbitrary as applied in this case.

## CONCLUSION

In accordance with Tenn.Code Ann. § 39–13–206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death was not imposed arbitrarily or capriciously, that the evidence supports the jury's finding of the statutory aggravating circumstance, and that the evidence supports the jury's finding that the aggravating circumstance outweighed evidence of mitigating circumstances beyond a reasonable doubt.

We have reviewed all of the issues raised by the defendant and conclude that they are without merit. With respect to issues not specifically addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge John Peay and joined in by Judges Joe B. Jones and Joe Riley. Relevant portions of that opinion are attached as an appendix. The defendant's sentence of death by electrocution is affirmed and shall be carried out on the 9th day of February, 1999, unless otherwise ordered by this Court or proper authority.

Costs of the appeal are taxed to the defendant, for which execution shall issue if necessary.

DROWOTA, BIRCH and HOLDER, JJ., concur.

## APPENDIX

### IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT JACKSON

### DECEMBER SESSION, 1993

State of Tennessee, Appellee,

v.

Kevin B. Burns, Appellant.

C.C.A. NO. 02C01–9605–CR–00170

Shelby County

Hon. Joseph B. Brown, Jr., Judge

(First-degree murder death penalty; attempted felony murder)

For the Appellant:

Glenn I. Wright

200 Jefferson Ave.
Suite 800
Memphis, TN 38103

William L. Johnson
N. Front St.
Suite 1150
Memphis, TN 38103

For The Appellee:

John Knox Walkup
Attorney General & Reporter

Darian B. Taylor
Asst. Attorney General
450 James Robertson Pkwy.
Nashville, TN 37243–0493

John W. Pierotti
District Attorney General

Thomas D. Henderson
–and–

John Wheeler Campbell
Asst. District Attorneys General
201 Poplar Ave.
Memphis, TN 38103

OPINION FILED: July 25, 1997

**CONVICTIONS FOR FIRST–DEGREE MURDER AND DEATH PENALTY AFFIRMED; CONVICTIONS FOR ATTEMPTED FELONY MURDER REVERSED AND REMANDED**

JOHN H. PEAY,

Judge

## OPINION

### ANALYSIS

### SUFFICIENCY OF THE EVIDENCE

The defendant first challenges the sufficiency of the evidence on which his murder convictions are based. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in

determining whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage,* 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973).

These murders were committed on April 20, 1992. At that time, the form of first-degree murder known as "felony murder" consisted of "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." T.C.A. § 39–13–202(a)(2) (1991 Repl). In this case, the murders were committed in the perpetration of a robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39–13–401(a) (1991 Repl). Furthermore, a person is criminally responsible for the conduct of another when the person, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, ... solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39–11–402(2) (1991 Repl).

In his statement to agent Harbaugh, the defendant indicated that he had accompanied Shaw and three other men to the scene of the crime and that their intent had been to confront the people who had "jumped" Shaw's cousin. Once they arrived in the general proximity, Shaw gave the defendant a handgun. Nothing in the record demonstrates that the defendant refused the weapon or was forced to carry it. The defendant further indicated in his statement that he had willingly walked toward Dawson's car and that he subsequently shot three times in the direction of the fleeing occupant. Thus, since there appears to be no doubt that the defendant was present at the scene of the crime, the pivotal question becomes whether the proof was sufficient to support a finding that he killed Dawson and Johnson in the perpetration of a robbery and/or that he was criminally responsible for the conduct of another in this respect.

The record establishes that Johnson, Dawson and Thomas were robbed as they sat in Dawson's car, and that they were all shot as soon as the robbery was complete. Thomas testified that Carlito Adams and several other individuals had surrounded the car, "[p]ulled out their pistols, had their pistols aimed at us. Took money from me; took jewelry from [Johnson]; took jewelry from [Dawson]." Upon being asked what happened next, he testified, "they opened fire, and they started shooting us." Shortly after the shootings, Thomas identified one of the assailants from a photo spread. He testified at trial that this had been the man who had taken his property and then shot him. Although Thomas did not make an in-court identification of the defendant, this photo spread was provided to the jury members and they were able to determine with their own eyes whether or not the photo was of the defendant. Moreover, agent Harbaugh testified that the photo appeared to be of the defendant. Thus, the jury could properly have concluded from Thomas' testimony alone that the defendant participated in the robbery and shot at the car's occupants. However, the jury also had before it Mary Jones' testimony that she had seen the defendant shoot Dawson, that she had been "looking right at him" and that "[a]s [the defendant] was running down the driveway, after he finished shooting [Dawson], that's when I got a real good look in his face." And Eric Jones' testimony corroborated Thomas' testimony that Thomas, Johnson and Dawson had all been robbed and then

fired upon. Johnson's mother testified that she had seen her son wearing a jewelry chain the morning of his murder. When he was found by the police, immediately after the shooting occurred, there was no jewelry.

Taken in the light most favorable to the State, this proof was more than sufficient to establish beyond a reasonable doubt that the defendant had participated in a robbery of Thomas, Johnson and Dawson and that, immediately following the robbery, he shot and killed Dawson. And although there was no direct proof that the defendant shot at and killed Johnson, the evidence established that Johnson had been shot while in the car following the robbery in which the defendant participated. Thus, although one or more of the other men surrounding the car and robbing its occupants may have actually fired the bullet that killed Johnson, the defendant remains responsible for Johnson's murder:

> The Tennessee offense [of felony murder during the perpetration of a robbery] extends both to the killer and his accomplices. A defendant who is a willing and active participant in a robbery becomes accountable for all of the consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer.

*State v. Middlebrooks*, 840 S.W.2d 317, 336 (Tenn.1992).

The felony murder statute dealt with in *Middlebrooks* was slightly different from the one at issue in this case, providing, "Every murder ... committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." T.C.A. § 39–2–202(a) (1982). In 1989, the statute was amended to provide that the killing in the perpetration of the enumerated felonies be "reckless." T.C.A. § 39–13–202(a)(2) (1989 Supp). "Reckless" in turn refers to a person who, although aware of a substantial and unjustifiable risk that a person or persons will be killed as a result of his conduct, nevertheless

consciously disregards that risk and engages in the conduct. *See* T.C.A. § 39–11–106(31) (1991 Repl). This Court has previously held that this addition of the word "reckless" to the felony murder statute "does not alter the principle that an accomplice to the underlying felony may also be guilty of felony murder even though the killing has been committed by a co-felon. The jury need only find that the defendant was a participant in the perpetration of the underlying felony and that his conduct as to the killing was 'reckless.' " *State v. Timothy D. Harris,* C.C.A. No. 02C01–9211–CR–00258, Shelby County, 1994 WL 123647 (Tenn.Crim.App. filed April 13, 1994, at Jackson), *rev'd on other grounds* (1996). And, as our Supreme Court noted in *Middlebrooks,* "one who purposely undertakes a felony that results in a death, almost always can be found reckless." 840 S.W.2d at 345.

In this case, the strongest legitimate view of the proof in favor of the State is that the defendant approached Dawson's car with a loaded pistol, participated in a robbery in which other armed individuals were also participating, and then shot several times into the car. The defendant's actions satisfy the statutory definition of "reckless." Accordingly, the proof at trial was sufficient to prove beyond a reasonable doubt that the defendant murdered Dawson in the perpetration of a robbery, and that he was criminally responsible for Johnson's murder in the perpetration of the same robbery. Both convictions are supported by the evidence and this issue is therefore without merit.

## SUPPRESSION OF DEFENDANT'S STATEMENT

The defendant next complains that the trial court erred when it denied his motion to suppress his statement. The defendant was apprehended in Chicago by FBI agents. He testified at the suppression hearing that he had been read his rights when he was first arrested and handcuffed. He also testified that he had understood his rights before making his statement, that he had not been promised anything in return for his statement, and that he had not been threatened into making his statement. However, when

asked at the suppression hearing, "you knew you didn't have to talk to [the agent]?", the defendant responded, "I didn't really understand, but I did because he was asking me questions." This is the crux of the defendant's contention that he did not waive his constitutional rights freely and voluntarily.

It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pre-trial statement. *State v. Pursley*, 550 S.W.2d 949, 952 (Tenn.1977). Moreover, the trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the appellant can show that the evidence preponderates against the trial court's ruling. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). In the instant case, the defendant has failed to demonstrate how the evidence preponderates against the trial court's ruling.

At the conclusion of the testimony at the suppression hearing, the trial court stated the following:

> The defendant says the person that handcuffed him gave him his rights on the scene—he didn't read them from a card, but he said them to him. He said he understood his rights. He doesn't remember all of them, but he knows that he was advised, 'You have a right to remain silent and anything you say can and will be used against you.'
>
> He doesn't recall the one about right to counsel, as is complained of in the motion; but he, too, does not deny that he was not [sic] told this. He admits, freely, that he was advised of his rights when he was initially handcuffed. Through his own statement, he was advised of his rights; he understood them; he's a high-school graduate; he was not coerced; he was not pressured; he was not threatened; nobody promised him anything.
>
> . . . .
>
> But from what the court has . . . seen here, it would appear that, on all fours, the defendant freely and voluntarily, understandingly, knowingly, advisedly, and intelligently waived his rights free from any

coercion, threats, pressures of any kind that would have induced him or caused him to have abandoned his rights.

> He claims he understood them, and from his testimony, the court would have to find that even if his recall is more accurate than that of Agent Landman, through his own evidence, the statement that is purportedly given by the defendant to Agent Landman would be admissible into evidence. The motion to suppress, respectfully, will be denied.

This ruling by the trial court was proper. Although he claims in his brief that he "did not understand his rights," the defendant admitted during the suppression hearing that he had understood the waiver form and that he had freely and voluntarily talked to the agents. There is nothing before this Court which preponderates against the trial court's findings. Accordingly, this issue is without merit.

### INSTRUCTION ON FLIGHT

In his next issue, the defendant contends that the trial court erred when it instructed the jury on flight. He further contends that this error was not harmless because of the "heavy emphasis" the prosecutor placed on it during closing argument. We disagree and find this issue to be without merit.

Agent Harbaugh testified that, in his statement, the defendant had admitted to leaving the crime scene immediately after the shootings. Later, he heard something about a shooting in East Memphis and thought it might be the one in which he had been involved. He then left his residence and went to Chicago where he remained until he was apprehended by the FBI in June 1992. He now contends that a jury instruction on flight was not warranted because he "never committed any act of hiding out, evasion or concealment of his person in the community."

The defendant misapprehends the circumstances necessary to justify a jury instruction on flight. This Court has previously recognized that there is evidence sufficient to support a jury instruction on flight where there is proof of " 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, *or a*

*leaving of the community for parts unknown.'* " *State v. Payton*, 782 S.W.2d 490, 498 (Tenn.Crim.App.1989) (citations omitted) (emphasis added). And the trial court in this case charged the jury accordingly, stating, *inter alia*,

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction; however, *it takes both the leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.*

(emphasis added). Here, the defendant both ran from the crime scene and subsequently left his home in West Memphis for Chicago. Such evidence supported a jury instruction on flight, and the trial court did not err in so instructing the jury. This issue is without merit.[1]

## ATTEMPTED FELONY MURDER

In addition to being convicted of two counts of felony murder, the defendant was convicted of two counts of attempted felony murder. The State correctly concedes that attempted felony murder does not constitute a crime in Tennessee. *State v. Kimbrough*, 924 S.W.2d 888, 892 (Tenn.1996). Accordingly, we reverse and dismiss those two convictions. However, we are left with the issue of whether the defendant may now be retried on the charges of attempted premeditated murder. The precise issue is whether a defendant may be retried under an alternative count on which the jury made no finding where the count of which the defendant was convicted fails to state an offense. We find this issue to be a matter of first impression in Tennessee.

A defendant may be retried for an offense when his conviction is set aside because of an error in the proceedings rather than because the State failed in its effort to prove him guilty. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *State v.*

*Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990). For instance, retrial is appropriate where the conviction is reversed due to the "incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct." *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Similarly, a defendant may be reindicted and tried on other offenses where his conviction is reversed because the underlying statute is later deemed unconstitutional. *State v. Hale*, 840 S.W.2d 307, 308 (Tenn.1992). In the instant case, the defendant's convictions for attempted felony murder are being reversed because our Supreme Court has ruled that no such offense exists. That is, due to a fundamental error in the proceedings, the defendant was tried for a crime which is impossible to commit. Obviously, he cannot be retried for attempted felony murder. We must determine, then, whether he can be retried for attempted premeditated first-degree murder. We hold that Burns has been neither convicted nor acquitted of these crimes and principles of double jeopardy do not therefore prohibit his retrial.

Burns was indicted for both attempted felony murder and attempted premeditated first-degree murder, and both counts were sent to the jury. However, the trial court instructed the jury in this case to first consider Count 1 of the indictments which charged the offense of attempted felony murder. The jury was instructed that if they found the defendant guilty of attempted felony murder, they would so report. The jury was further instructed that if they found the defendant not guilty of that offense, they would then proceed to inquire as to his guilt of attempted premeditated first-degree murder as charged in Count 2 of the indictments. In other words, the jury was not to consider attempted premeditated first-degree murder if they found the defendant guilty of attempted felony murder.

Typically, when a jury is given a multi-count charge and returns a special verdict convicting the defendant of one of the charges but which is silent as to the other charges, the defendant is deemed acquitted

---

1. Our ruling that the trial court's instruction to the jury on flight was not error renders moot the defendant's contention that the "error" was not harmless.

of the other charges. *See, e.g., Conner v. State,* 531 S.W.2d 119, 126 (Tenn.Crim.App. 1975). The State is then prohibited from retrying the defendant on the acquitted charges even if the conviction is later reversed. *Id.* As this Court held in *State v. Arnold,* however, "we are of the opinion that this rule is not applicable to the situation involved in the present case." 637 S.W.2d 891, 895 (Tenn.Crim.App.1982).

In *Arnold,* each of the defendants had been charged with a conspiracy to engage in the protracted and repeated sales of controlled substances, with being a habitual drug offender, and with specific drug transactions as separate and additional offenses. The controlling statute (and the jury instructions) limited the jury to finding the defendants guilty of either being habitual drug offenders or of committing the specific drug deals, but not both. The jury found each of the defendants guilty of being a habitual drug offender. On appeal, this Court found the evidence to have been insufficient to support the habitual drug offender convictions. Nevertheless, the case was remanded for a new trial on the specific drug transactions.

In so holding, this Court acknowledged the general rule that "a special verdict upon one count of an indictment operates as an acquittal upon the other counts to which the jury did not respond." *Arnold,* 637 S.W.2d at 895. In distinguishing the case before it, this Court reasoned that

> [i]mplicit in the jury's verdict finding the appellants guilty under the first count of being habitual drug offenders is a finding of their guilt of the transactions separately charged in the fourth and fifth counts; yet, because of the restrictions in the statute, the jury, once it found the appellants guilty under the first count, was precluded from reporting a verdict of guilt on the separate offenses charged in the fourth and fifth counts.
>
> Therefore, we conclude that because of the restrictive language contained in the habitual drug offender statute, the jury's failure to report a verdict on the fourth

and fifth counts did not operate as a verdict of acquittal on those charges, and a remand for trial on those counts would be in order.

*Arnold,* 637 S.W.2d at 895. Although we are not dealing with a statutory restriction in the case *sub judice,* we find the trial court's instructions to the jury to have operated to the same effect. Once the jury found Burns guilty of attempted felony murder, its instructions were to move on and make no report on the charges of attempted premeditated murder and its lesser offenses. Yet, implicit in the convictions for attempted felony murder was a finding that the defendant had indeed attempted to kill two people. While we cannot know whether the jury would have convicted the defendant of attempted premeditated murder or one of its lesser offenses had it been given the opportunity to consider those charges, the evidence was certainly sufficient for it to have done so.

The United States Supreme Court has also spoken on implied acquittals, finding them to bar retrial under the federal Double Jeopardy Clause [2] when the jury has been given "a full opportunity to return a verdict" on a charge and instead found the defendant guilty of a lesser charge. *Price v. Georgia,* 398 U.S. 323, 329, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970)(footnote omitted). *See also Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). That is, "[o]nly where the jury is given the full opportunity to return a verdict *either* on the greater *or, alternatively,* on the lesser included offense does the doctrine of implied acquittal obtain." *United States v. Reed,* 617 F.Supp. 792, 800 (D.C.Md.1985) (emphasis in original). While we realize that attempted premeditated murder is not a lesser offense of attempted felony murder, we are convinced that the same analysis is appropriate. *See Schiro v. Farley,* 510 U.S. 222, 236, 114 S.Ct. 783, 792, 127 L.Ed.2d 47 (1994) ("The failure to return a verdict does not have collateral estoppel effect ... unless the record establishes that the issue was actually and necessarily decided in the defendant's favor.") Here, the jury was not given the full opportunity to return a verdict either on attempted felony murder

2. U.S.Const. amend. V.

or, alternatively, on attempted premeditated murder and its lesser offenses. Because the jury was not given that opportunity, its verdict did not necessarily resolve in Burns' favor the issue of his guilt of the alternative crimes and the doctrine of implied acquittal should not apply.[3]

Finally, our Supreme Court has made it clear that a defendant may be retried for lesser offenses following reversal of his or her conviction for the greater offense. *State v. Maupin,* 859 S.W.2d 313, 317 (Tenn.1993). In *Maupin,* the defendant had been charged in a single count indictment with aiding and abetting first-degree murder of a child resulting from repeated child abuse. The jury was charged with the indicted offense as well as with the lesser offenses of aiding and abetting second-degree murder, aiding and abetting aggravated child abuse and aiding and abetting child abuse. nThe jury convicted the defendant of the aiding and abetting first-degree murder charge. However, the statute creating that grade of first-degree murder, T.C.A. § 39-2-202(a)(2)(Supp.1988), was later found unconstitutional. *State v. Hale,* 840 S.W.2d 307 (Tenn.1992). Accordingly, our Supreme Court reversed Maupin's conviction but ruled that she could be retried on the lesser offenses. In so holding, the Court stated:

Maupin was not acquitted of any of the lesser offenses as the jury was not required to pass judgment upon them.

. . .

[D]ouble jeopardy should not bar a retrial when the trier of fact does not pass upon lesser offenses one way ,or the other. There having been no factual resolution of Maupin's guilt or innocence on the lesser offenses, she can be tried for those offenses without violating double jeopardy.

. . .

We find no double jeopardy impediment in allowing Maupin, like Hale, to be tried for lesser offenses simply because she was convicted of the greater offense under a flawed statute.

859 S.W.2d at 318–19.

Similarly, in the case at bar, the jury was not required to pass on the alternative counts of attempted premeditated murder and its lesser offenses and there has therefore been no factual resolution of the defendant's guilt or innocence of those crimes. Indeed, the only factual resolution made by the jury on the attempted murder counts was that the defendant *did* attempt to murder two people. Analogously to Maupin, the defendant in this case was convicted of an offense under a flawed legal interpretation of the attempt and felony murder statutes. The jury was not given an opportunity to convict Burns of

---

**3.** *Cf. Saylor v. Cornelius,* 845 F.2d 1401 (6th Cir.1988). In *Saylor,* the defendant had been indicted on one count of murder, which count encompassed murder as a principal, as an accomplice, and by conspiracy. The trial court instructed the jury only on the theory of the defendant's involvement as a conspirator. The prosecution did not object to the instructions nor request a charge on accomplice liability. The jury convicted the defendant and the conviction was later reversed for insufficient evidence. Although there was "considerable evidence" supporting the defendant's role as an accomplice, the 6th Circuit Court of Appeals held that double jeopardy principles barred retrial on that ground. The Court stated, "Once the jury returned its verdict, the failure to instruct on the accomplice liability theory terminated Saylor's jeopardy. . . . To deny this proposition would mean that the prosecution could proceed on several theories of liability throughout a trial, and, simply by withholding instructions on any one of them, reserve that theory for retrial at a later date." 845 F.2d at 1404. The Court later limit-

ed its holding in *Saylor,* stating that its significance was "limited by the unusual situation we were addressing in that case: because of prosecutorial absent-mindedness, Mr. Saylor's trial ended without an acquittal or a conviction on a charge that had been properly presented in an indictment and emphasized at trial." *U.S. v. Davis,* 873 F.2d 900, 906 (6th Cir.1989). This case is clearly distinguishable from *Saylor,* although both cases involve unfortunate jury instructions. In *Saylor,* the trial court's action was the functional equivalent of a dismissal of the accomplice theory, in which the prosecution acquiesced. The defendant, on the other hand, had objected to proceeding on the conspiracy theory. In the present case, the trial court did submit the alternative count to the jury but, in effect, relieved it of its duty to consider that count upon its finding Burns guilty of attempted felony murder. The prosecution was in no way trying to "reserve a theory" for later use in the event the jury acquitted the defendant of attempted felony murder.

the cognizable crimes of attempted premeditated murder or its lesser offenses. Double jeopardy should not, therefore, bar his retrial for these offenses. Accordingly we hold that this matter is to be remanded for the defendant to be retried on two counts of attempted premeditated murder.

## SPECTATOR DISPLAY

The defendant also contends that he should be given a new trial because of an "outburst" by members of the victims' families during testimony. He argues that this "outburst" was "prejudicial and designed to gain the jurors' sympathy." However, upon his lawyer's objection, the trial court found as follows:

> What you have here is two individuals involved—the mothers of the deceased two individuals. It was not a great outburst. It was something the court would characterize more as a sob, and that was closely contiguous with testimony that the deceased, [Johnson], somehow got out of the car; he stopped to see if traffic was coming—car was coming; he got across the street; he was holding his hands out. The witness demonstrated saying "Help me, help me," then he stumbled and fell. At that point, I believe one of the ladies, who was a parent of that deceased, and one other who was the parent of the other deceased, got up and left the courtroom. They didn't slam the door or anything like that. I wouldn't say there was a great hubbub or anything like that. One of them sobbed. I would not say it was a particularly loud one. It was noticeable, but that's about it.
>
> . . . .
>
> I don't think it's unexpected by any of the jurors that someone would not have some emotional reaction to a description of their child.
>
> . . .
>
> Under the circumstances, as they exist right now, the court does not think it's something that's going on, on an on-going basis. It does not appear to be any calculated display of histrionics or anything like

> that for the purpose of influencing the jury or soliciting or eliciting their passions.
>
> . . . .
>
> It was not anything that was done overtly. It was a sob, and the parties immediately removed themselves without undue display when their emotions got out of control. Now, I don't believe there are going to be any other witnesses that would testify to being eyewitnesses to these events. So, I don't think the problem is going to rise again.
>
> . . .
>
> I don't think that the behavior exhibited by the two ladies in question is outrageous or anything like that or particularly offensive. I don't think it's likely to happen again, so I don't think we will have any further problem. But in any event, looking at the jury's reaction—I always do that—it did not appear that they were unduly disturbed by the thing.

We first note that defense counsel did not move for a mistrial at the time this incident occurred. Rather, he objected and requested that the mothers remove themselves from the courtroom if the testimony was "going to be too painful for them to sit [there] without an outburst." Defendant then raised for the first time in his motion for new trial the argument, again presented here, that the trial court should have *sua sponte* granted a mistrial.

We disagree. As this Court has stated earlier,

> The entry of a mistrial is appropriate when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur.
>
> Whether an occurrence during the course of a trial warrants the entry of a mistrial is a matter which addresses itself to the sound discretion of the trial court; and this Court will not interfere with the exercise of this discretion absent clear abuse appearing on the face of the record.

*State v. McPherson,* 882 S.W.2d 365, 370 (Tenn.Crim.App.1994). In *McPherson,* the defendant was on trial for aggravated rape. In recounting the crime on the witness stand, the victim became upset. The court called a

recess, but before the jury had left the room, the victim-witness coordinator for the district attorney's office came into the courtroom and began hugging the victim. The defendant requested a mistrial, which the trial court denied on the grounds that it was " 'satisfied beyond a reasonable doubt that it did not change the outcome of [the] trial.' " *Id.* This Court affirmed the trial court's decision, finding no abuse of discretion. Similarly, in *State v. Adkins*, the minor victim became upset and cried while on the witness stand in an aggravated sexual battery case. The jury was not sent out of the courtroom until two to four minutes had passed. On appeal, the defendant contended that he was entitled to a mistrial and new trial on this basis. Our Supreme Court held, "We do not believe the behavior of the witness was so prejudicial that the defendant could not receive a fair trial.... The granting of a mistrial is within the discretion of the trial court. A reviewing court will not disturb that action absent a finding of abuse of that discretion." 786 S.W.2d 642, 644 (Tenn.1990).

In the instant case, although no motion for mistrial was made, it is clear from the court's remarks in response to defense counsel's objection that it had determined the defendant suffered no prejudice from the victims' mothers' conduct. Defense counsel declined to request a curative instruction and appeared satisfied with the trial court's response to his objection. No abuse of discretion has been demonstrated in the trial court's refusal to declare a mistrial *sua sponte*. This issue is without merit.

## ADMISSION OF PHOTOGRAPH

In his next issue, the defendant contends that the trial court erred by admitting into evidence a photograph of the driver's seat in which Dawson had been sitting. The photograph depicts bloodstains on the seat as well as a small amount of unidentified material which the defendant describes as "what could be considered guts." He argues that the photograph was not probative of any issue and that it was prejudicial and served merely to "inflame the jury." The State responds that the photograph was offered in order to prove that Dawson "did not have a weapon in the front seat, and to show the force from the close range shots that threw [him] over to the armrest, where he bled considerably." At trial and upon the defendant's objection to the introduction of this photograph, the trial court found,

> There is some smearing of blood. I don't believe—well, in the court's opinion, looking at that, it's not unduly prejudicial. It doesn't elicit any particular revulsion in light of what's commonly on television for adult viewing these days.... It's not particularly bloody. Now, I don't think any adults or any ordinary jury is going to get particularly revolted or so distressed by looking at some moderate to small amount of dried blood on a front seat.

Under our rules of evidence, the test for determining whether evidence is "relevant" is easy to pass: "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Tenn. R. Evid. 401. As the State points out in its brief, the defendant had been charged with premeditated firstdegree murder. In order to prove this offense, the State had to prove that the defendant killed Dawson intentionally, deliberately and with premeditation. *See* T.C.A. § 39–13–202(a)(1) (1989 Supp). The amount of blood depicted in the photograph, together with the implied position of the victim's body, satisfies the definition of relevant evidence insofar as tending to prove that the defendant shot Dawson intentionally and/or deliberately. That is, the photograph was probative as to the effect of the gunshots upon Dawson's body and, therefore, as to the issue of whether the defendant shot him accidentally or intentionally and/or deliberately. The photograph was also probative as to the State's theory of how the victim was killed. Therefore, we disagree with the defendant that the photograph was not relevant.

While relevant, a photograph may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. However, this balancing test is committed to the sound discretion of the trial court, and its decision

will not be disturbed on appeal absent a showing of clear abuse of discretion. *State v. Stephenson,* 878 S.W.2d 530, 542 (Tenn.1994). No such showing has been made here. This issue is accordingly without merit.[4]

## TRIAL COURT'S RESPONSE TO JUROR QUESTIONS

In his next issue, the defendant asserts that the trial court erred in its response to the jury when the jury asked certain questions during its deliberations in the penalty phase of the trial. Those questions propounded by the jury to the trial court were as follows:

(1) How many years for life?

(2) What does 'life sentence' mean?

(3) Can we ask for life without parole? Can we stipulate life plus so many years?

(4) Can we ask for consecutive life sentences?

(5) What does it mean if you're sentenced to death and life?

In response to these questions, the trial court stated, "All right. You're directed to refer to the charges and instructions that are contained in the jacket. Thank you. You may retire to continue your deliberations." The defendant contends that the questions posed indicated that the jury was considering improper matters, and that the trial court "should have directed the jury that the questions posed were not proper considerations in the determination of the sentence." The defendant concedes that there is no authority for the requirement that the trial court give this direction prior to referring the jury to the charge and instructions given initially. The State responds, first, that this issue is waived because the defendant did not object to the trial court's response to the jury's questions at the time it was given, and second, that the trial court's response was proper and that this issue is therefore without merit even if we should consider it.

We agree with the State on both counts. As a general rule, "[a] party cannot witness misconduct on the part of the court, await

the result of the verdict, and then, if it is against him or her, object to the alleged misconduct." *State v. Tune,* 872 S.W.2d 922, 930 (Tenn.Crim.App.1993). The trial court in this case took the questions from the jury after recalling counsel, the defendant, the court reporter and the jury back into open court in order to take the matter up on the record. Thus, defense counsel had every opportunity to object at the time the trial court gave its response. Defense counsel chose not to do so. The defendant will not now be heard to complain. *See* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Even if the defendant had not waived this "error," however, this issue has no merit. As the defendant acknowledges, the trial court followed the proper method of fielding the jury's questions. *See State v. Mays,* 677 S.W.2d 476, 479 (Tenn.Crim.App.1984) ("The proper method of fielding questions propounded by the jury during deliberations is to recall the jury, counsel, the defendant(s), and the court reporter back into open court and to take the matter up on the record.") Additionally, contrary to the defendant's contention, the trial court responded properly to the jury's inquiry. *See, e.g., State v. Johnson,* 698 S.W.2d 631 (Tenn.1985). In *Johnson,* a capital case, our Supreme Court addressed a situation in which one of the jurors had asked questions regarding parole during *voir dire.* The Court stated, "the preferable response to a juror's inquiry about parole is to instruct the jury to limit their deliberations to the instructions given them at the close of the evidence." *Id.* at 633. That is exactly what the trial court did in this case. In *State v. Smith,* 857 S.W.2d 1 (Tenn.1993), another capital case, our Supreme Court again addressed the proper response to jury inquiries about sentencing and parole. The trial court had refused to supplement its original instructions. The defendant argued that information about parole eligibility might operate as mitigating evidence and the

---

4. Even if the photograph were not relevant, we deem its admission to have been harmless error in light of the other evidence against the defendant.

trial court's refusal to give additional instructions "somehow create[d] a non-statutory aggravating factor of future dangerousness." 857 S.W.2d at 11. The Court rejected this argument, opining "that to provide a jury with the sort of information requested by defendant could result in sentences of death based on sheer speculation and on factors other than those enumerated in T.C.A. § 39–2–203 and sanctioned under either [the Tennessee or United States] Constitution." *Id.* The trial court did not err in its response to the jury's questions in this case, and this issue is therefore without merit.

### PROPRIETY OF DEATH SENTENCE

The defendant next contends that "his role was minor in this case, and as such, requires reversal of the death sentence." We first note that the death penalty in this case was imposed for the defendant's felony murder of Damond Dawson. We also note, as set forth above, that the evidence was sufficient to support the jury's verdict that the defendant murdered Dawson in the perpetration of a robbery. The defendant's role in this crime, as determined by the jury, was hardly "minor."

The defendant argues that, since he was under the impression he was joining the other assailants to participate in a fight, and that he had no knowledge of the robbery or intent to commit it, the sentence imposed is disproportionate to his culpability, relying on *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *State v. Branam,* 855 S.W.2d 563 (Tenn.1993). In *Branam,* our Supreme Court outlined the controlling law addressing the defendant's claim, construing *Enmund* in the process:

> In *Enmund v. Florida,* ... the United States Supreme Court held that death is a disproportionate penalty and, therefore, constitutes cruel and unusual punishment under the Eighth Amendment, where it is imposed against a defendant 'solely for participation in a robbery in which another robber takes life,' without proof that the defendant himself attempted or intended to kill, or intended that lethal force be used. This constitutional standard was re-

fined by the Court in *Tison v. Arizona* [481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127] ... in which it was held that the Eighth Amendment does not prohibit the death penalty in the case of a defendant whose participation in a felony that results in murder is major and whose mental state at the time is one of reckless indifference to the value of human life—even though the proof fails to show intent to kill.

855 S.W.2d at 570.

The defendant's argument on this issue assumes that the evidence was insufficient to prove that he is guilty of felony murder. As is seen above, however, the evidence does sufficiently prove his guilt. Even if the defendant did not actually shoot Dawson, as the evidence indicates, the defendant's own statement that he shot several times at Blackman demonstrated that he "attempted or intended to kill, or intended that lethal force be used." At the very least, this represents a "reckless indifference to the value of human life." This issue is therefore without merit.

We deem it appropriate to consider within the context of this issue the propriety of the defendant's death sentence in light of the determinations which our legislature requires this Court to make in every direct appeal of death penalty cases. That is, we must determine whether the defendant's sentence of death was imposed in any arbitrary fashion; whether the evidence supports the jury's finding of the aggravating circumstance; whether the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances; and whether the defendant's death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. T.C.A. § 39–13–206(c)(1) (1996 Supp).

As set forth above, we have determined that the evidence supports the jury's finding of the aggravating circumstance that the defendant knowingly created a great risk of death to two or more persons, other than Dawson, during his murder of Dawson. The evidence also supports the jury's finding that this aggravating circumstance outweighed the mitigating circumstances offered during

the penalty phase of the trial.[5] We further find, based upon our review of the entire record of this cause, that the sentence of death was not imposed in any arbitrary fashion. Finally, we have determined that the death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the nature of this felony murder and the defendant.[6]

## CONSTITUTIONALITY OF DEATH PENALTY

In his last contention, the defendant maintains that Tennessee's death penalty statutes are unconstitutional. He acknowledges that his challenges have been rejected by our Supreme Court, but reserves the issues for later review. This Court is, of course, bound by our Supreme Court's prior holdings that Tennessee's death penalty statutes are constitutional. Accordingly, we hold without further discussion these issues to be meritless. *See, e.g., State v. Smith,* 893 S.W.2d 908 (Tenn.1994), *cert. denied,* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995); *State v. Brimmer,* 876 S.W.2d 75 (Tenn.1994), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994); *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994), *cert. denied,* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); *State v. Smith,* 857 S.W.2d 1 (Tenn. 1993), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *State v. Black,* 815 S.W.2d 166 (Tenn.1991); *State v. Boyd,* 797 S.W.2d 589 (Tenn.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991); *State v. Teel,* 793 S.W.2d 236 (Tenn. 1990), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990).

The defendant's convictions for attempted felony murder are reversed and dismissed and this cause is remanded for further proceedings on the two counts of attempted premeditated murder. The judgment below is otherwise affirmed.

---

5. The mitigation proof consisted of the defendant's parents' testimony that he was a "good son" and that they loved him; his brother's testimony that the defendant had been a good employee and that he had never known the defendant to be violent; testimony that the defendant had attended church services regularly; and that he had been well behaved in jail.

6. The statutorily required determination that the death penalty was not imposed in an arbitrary fashion was made without the benefit of the "Report of Trial Judge in Capital Cases" as required by our Supreme Court in its Rule 12. The absence of this report does not prevent us from conducting the required review. *See State v. Cazes,* 875 S.W.2d 253, 270 (Tenn.1994).