# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 15, 2000 Session

## STATE OF TENNESSEE v. JAMES P. STOUT

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 96-08227, 96-08228, 96-08229      Joseph B. Dailey, Judge**

---

### No. W1998-00079-SC-DDT-DD - Filed May 24, 2001

---

The defendant, James P. Stout, was convicted of felony murder, especially aggravated kidnapping, and especially aggravated robbery. Following the sentencing phase of the trial for felony murder, the jury found that the evidence supported three aggravating circumstances: (1) that the defendant was previously convicted of a felony whose statutory elements involved the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery or kidnapping. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (Supp. 1995). Upon finding that the evidence of these three aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death.

The Court of Criminal Appeals affirmed the convictions and sentences, and the case was docketed in this Court.[1] After reviewing the decision of the Court of Criminal Appeals, the record, and the applicable authority, we designated seven issues for oral argument[2] and conclude as follows: (1) the evidence was sufficient to support the jury's verdict; (2) the trial court did not commit reversible error in allowing Tonya Woodall to testify as to statements made by Quentin Jordan; (3) the admission of facts underlying the defendant's prior conviction for a violent felony during sentencing did not affect the jury's determination to the prejudice of the defendant; (4) the prosecutor's use of the defendant's prior convictions to cross-examine a defense witness during sentencing did not affect the jury's determination to the prejudice of the defendant; (5) the exclusion

---

[1]     See Tenn. Code Ann. § 39-13-206(a) (1997) (Upon the Court of Criminal Appeals' affirmance of a death sentence, the appeal shall automatically be docketed in the Supreme Court).

[2]     "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

of mitigating evidence offered by the defendant during sentencing did not affect the jury's determination to the prejudice of the defendant; (6) the felony murder aggravating circumstance was properly applied; and (7) the sentence of death was not arbitrary or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, C.J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., filed a concurring and dissenting opinion.

Robert C. Brooks and William D. Massey, Memphis, Tennessee, for the appellant, James P. Stout.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Joseph F. Whalen, Assistant Attorney General; John W. Pierotti, District Attorney General; and Jerry Harris and Lee Coffee, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Guilt Phase

The defendant, James P. Stout, was convicted of the felony murder, especially aggravated kidnapping, and especially aggravated robbery of the victim, Amber Hunter, age 26. The evidence is summarized as follows.

On November 8, 1995, the defendant and three co-defendants, Derrick Carmichael, Robert Terrell, and Quentin Jordan, were at the apartment of Tonya Woodall in Memphis, Tennessee. Jordan testified that the four men left Woodall's apartment in a blue Corsica driven by Terrell. The defendant, who was in the front passenger seat, saw the victim driving her car and said that he "was going to get this whore." The four men followed the victim for five or ten minutes and then pulled behind her car as she parked in front of her house.

According to Jordan, the defendant got out of the car, grabbed the victim by her hair, put a gun to her stomach, and forced her into the backseat of her car. The defendant got in the driver's seat of the victim's car while Jordan got in the backseat with the victim. The defendant handed the gun to Jordan. Jordan testified that the defendant asked the victim if she believed in God. When the victim said that she did, the defendant said, "Well, you're with the devil now." When Jordan addressed the defendant by name at one point, the defendant replied that the victim would have to be killed because she knew his name and had seen his face. The defendant stopped the victim's car near some railroad tracks, took the gun back from Jordan, got out of the car, and pulled the victim

from the rear seat. According to Jordan, the defendant asked the victim if she "wanted to hug a real man before she died." The defendant embraced the victim; then he stepped back and shot her once in the head. After taking a suitcase from the victim's car and trying to wipe off any fingerprints, the defendant and Jordan left the scene with Terrell and Carmichael.

Like Jordan, Derrick Carmichael testified that he, the defendant, Jordan, and Terrell left Tonya Woodall's apartment in a blue Corsica. The defendant spotted the victim driving her car, instructed Terrell to follow the car, and said he was going to "rob" the victim. When the victim parked in front of her house, the defendant and Jordan got out of the car and approached her. The defendant, who was armed with a gun, grabbed the victim before she made it to her house. The defendant gave the gun to Jordan, who got in the backseat of the victim's car with the victim. The defendant drove the victim's car and Terrell and Carmichael followed them. According to Carmichael, the defendant parked near some railroad tracks and got out of the car with the victim and Jordan. The defendant hugged the victim and then shot her. The defendant and Jordan got back in the Corsica and the four men left the scene.

Robert Terrell's testimony was similar to that of Jordan and Carmichael. He testified that as they left Tonya Woodall's apartment, the defendant was checking a small pistol for bullets and said they "were going to make a sting." The defendant tried to get Terrell to follow several cars, but Terrell refused. Terrell testified that the defendant told him to park the car while he went to his aunt's house; when Terrell stopped the car, the defendant and Jordan got out. Terrell testified that he then saw the defendant and Jordan driving toward him in a red car, and he followed. When the defendant stopped the car, Terrell saw Jordan and the victim get out of the backseat. Terrell testified that the defendant hugged the victim and then shot her once in the head. The defendant and Jordan returned to the car Terrell was driving with some of the victim's property. Terrell drove the defendant and Jordan back to Woodall's apartment and also saw them at the apartment the next night. According to Terrell, Jordan was upset, crying, and cursing the defendant. The defendant said, "Well, she heard my name, so I had to kill her."

Tonya Woodall testified that the defendant, Jordan, Carmichael, and Terrell were together at her apartment on November 8, 1995. On the following day, she saw Jordan, who looked "depressed" and "upset." Jordan initially would not tell Woodall what was wrong, but finally told her that the defendant had killed a woman. Woodall later heard Jordan confronting the defendant, but she did not hear the defendant make a response. Woodall testified that the police threatened to charge her as an accessory to the offense unless she made a statement. She also testified that the defendant had threatened her and her family if she testified.

The defendant gave a statement to police that varied markedly from the above testimony of Jordan, Carmichael, and Terrell. The defendant said that he, Jordan, and two others – Vassy Gandy

and Rico Bowers – were at Tonya Woodall's apartment on the night in question.[3]  When they left, they rode around in a white Mustang with Gandy driving and the defendant in the backseat.  Bowers, who was armed with a pistol, told Gandy to follow the victim's car.  When the victim's car stopped, Bowers got out and grabbed the victim by her hair and forced her into the backseat of her car with Jordan.  According to the defendant's statement, Bowers drove the victim's car to some railroad tracks and got out of the car with Jordan and the victim.  Bowers hugged the victim, backed away about five feet, and fired one shot.  Bowers and Jordan searched the victim's car and wiped it down.  According to the defendant's statement, the four men returned to Woodall's apartment where Jordan and Bowers "bragged" about what had happened.  The defendant denied knowing that a robbery, car jacking or killing was going to occur.[4]

The victim, Amber Hunter, a total stranger to the defendant, was 26 years old at the time she was killed.  She was a college graduate and was employed at a bank.  She was returning home from a church service on the night she was killed.  The victim sustained a gunshot wound to her head and remained unconscious until her death two days later on November 10, 1995.

After hearing the evidence and deliberating, the jury found the defendant guilty of felony murder for the killing of the victim in the perpetration of a robbery, especially aggravated kidnapping, and especially aggravated robbery.  The trial then moved into the sentencing phase for the offense of felony murder.

## Sentencing Phase

In seeking the death penalty for the defendant's conviction for felony murder, the prosecution introduced evidence that the defendant was convicted of especially aggravated robbery in January of 1997.  The victim of that offense, Walter Bush, testified during the sentencing phase that he was car-jacked and shot in the head by the defendant on November 11, 1995.  Bush testified that the defendant had first asked if he knew the defendant or would recognize him and that when Bush said no, the defendant told him to walk away.  When Bush had walked three or four feet, the defendant shot him.   Bush admitted that two other men had been with the defendant and that two of the men had guns.  Bush nonetheless testified that the defendant was the person who shot him.

The defendant presented several witnesses in mitigation.  The defendant's mother, Annette Bailey, testified that she was an exotic dancer and prostitute at the time she became pregnant with the defendant and that she used cocaine during the pregnancy.  When the defendant was three weeks

---

[3]     Woodall testified that Gandy and Bowers had not been at her apartment on the day of the offense. Likewise, Jordan and Terrell testified that they did not see Gandy or Bowers on the night of the offense. Carmichael, on the other hand, testified that he saw both Gandy and Bowers at Woodall's apartment on the night of the offense.

[4]     In his statement, the defendant said that he, Jordan, Bowers and Gandy were members of a gang called the "gangster disciples."  During the trial, however, the defendant attempted to show through cross-examination that the others falsely accused him of the crime because he was a former member of the gang.

old, Bailey gave him to her mother, Francis Beasley, who later obtained custody. Bailey testified that she rarely saw the defendant and felt that his problems were her fault. She said that the defendant's father knew about the trial, but would not appear on behalf of the defendant.

Francis Beasley testified that she had six children, including the defendant's mother, and that she raised the defendant as "one of her own." All of her children, except the defendant's mother, helped to raise the defendant and engaged in family activities. Beasley took the defendant to church every Sunday, and the defendant continued to be an active member of the church up until the time of his arrest. The defendant had treated her with love and respect and had been very close to Beasley's husband before his death in 1991. Beasley testified that when the defendant was 16 or 17, he was "devastated" when his mother told him she wished he had never been born. Beasley asked the jury to spare the defendant's life.

Sheronda Bond testified that she was the defendant's fiancée and that she and the defendant had a child together. Their child, as well as the defendant's older child through another relationship, visited the defendant in prison. According to Bond, the defendant shows love and concern for the children. She asked the jury to spare the defendant's life.

Other family members testified on the defendant's behalf. Thomas Stout, the defendant's grand-uncle, testified that he was the Pastor in the church attended by the defendant. He visited the defendant in prison, where they discussed scripture and read the Bible. Teresa Stout, the defendant's aunt, testified that she had been close to the defendant his entire life and that the defendant was "devastated" when his grandfather passed away in 1991. She asked the jury to spare the defendant's life.

Randall Stout, the defendant's uncle, testified that he went to church with the defendant and taught him how to play musical instruments with the church choir. He testified that the defendant was not a "villain" and had been a nice child. He testified that the defendant had continued his involvement in the church and was a "changed person." On cross-examination, Stout acknowledged that the defendant was involved with a gang called the "gangster disciples." Stout was also aware of the defendant's prior convictions for aggravated burglary, theft, reckless endangerment, and the especially aggravated robbery of Walter Bush. Stout nonetheless said that the charges against the defendant had been "trumped up."

Makimba Fowler testified that he was in jail with the defendant in June of 1993. Both men were members of a gang called the gangster disciples, which had a large number of members in the jail. Fowler testified that the defendant was expelled from the gang when he was beaten by other gang members and stabbed with an ink pen. Donald Justus, a prison jailor, testified that he saw the defendant in June of 1993 with a "bruised eye and stuff." Justus testified that prisoners who were not gang members were often in danger from gang members.

The jury determined that three aggravating circumstances had been proven beyond a reasonable doubt: (1) the defendant was previously convicted of a felony whose statutory elements

involve the use of violence to the person; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (3) the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery or kidnapping. See Tenn. Code Ann. § 39-13-204(i)(2), (6), & (7) (Supp. 1995). The jury found that the evidence of these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and, therefore, imposed a death sentence. See id. § 39-13-206 (1991 & Supp. 1995). In a separate sentencing proceeding, the trial court imposed two forty-year sentences for the offenses of especially aggravated robbery and especially aggravated kidnapping, to be served consecutively to one another and consecutively to the death sentence.

## Sufficiency of the Evidence

The defendant argues that there was no evidence to corroborate the testimony of the accomplices to the offense and that, therefore, the evidence was insufficient to support his convictions. The State maintains that the evidence was legally sufficient to support the convictions in this case and to corroborate the testimony of the three accomplices.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979) (citation omitted); State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Keough, 18 S.W.3d at 181 (citation omitted). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964). We have described the nature of this requirement as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of

> the crime charged. It is not necessary that the corroboration extend
> to every part of the accomplice's evidence.

State v. Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is a determination for the jury. See State v. Bigbee, 885 S.W.2d at 803.

In our view, there was sufficient evidence to sustain the jury's verdicts that the defendant committed the offenses of felony murder, especially aggravated kidnapping, and especially aggravated robbery, and there was sufficient evidence to corroborate the testimony of the accomplices to these crimes. As the Court of Criminal Appeals noted, the defendant initially denied knowledge of the offenses when questioned by police, but then later admitted that he was at the scene. Moreover, the defendant admitted that he knew one of the participants was armed and intended to steal a car. Finally, Tonya Woodall testified that the defendant threatened her and her family if Woodall testified against him. When viewed under the standards discussed above, we conclude that there was sufficient evidence to corroborate the testimony of the accomplices and to support the jury's verdicts.

### Admissibility of Hearsay Statements

The defendant asserts that the trial court erred by allowing Tonya Woodall to testify that Quentin Jordan told her that the defendant had killed the victim and other details about the offenses because the statements were inadmissible hearsay. The State maintains that the Court of Criminal Appeals properly determined that Jordan's statements were admissible as a prior identification and as an excited utterance. See Tenn. R. Evid. 803(1.1), 803(2).[5]

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A hearsay statement is not admissible unless it is shown to be admissible via an exception contained in the rules of evidence or otherwise by law. See Tenn. R. Evid. 802. The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court. See State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997). We will not reverse the ruling of the trial court absent a showing that this discretion has been abused. See id.

### Prior Identification

---

[5] The State does not contest the Court of Criminal Appeals' ruling that the statements were not admissible as the statements of a co-conspirator or as statements against Jordan's penal interest. See Tenn. R. Evid. 803(1.2)(E), 804(b)(3).

The defendant argues that the trial court erred in allowing Woodall to testify as to Jordan's statement as a prior identification pursuant to Tenn. R. Evid. 803(1.1). The State maintains that the trial court did not abuse its discretion in admitting the testimony.

The hearsay rule does not exclude a "statement of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." Tenn. R. Evid. 803(1.1). Thus, a party seeking to admit evidence under this exception must establish four elements: (1) that the declarant made an identification of a person; (2) that the identification was made after perceiving the person; (3) that the declarant testified at the hearing or trial in which the prior identification was introduced; and (4) that the declarant was subject to cross-examination about the statement. See Neil P. Cohen et al., Tennessee Law of Evidence, § 803(1.1).2, at 507-08 (3d ed. 1995).

The prior identification exception is most often used in a criminal case where the victim or witness has identified the defendant from a sketch, lineup, or photographic display and then later testifies at a hearing or trial regarding the earlier identification. The fact that the prior identification was made is admissible under Rule 803(1.1) as substantive evidence regardless of whether the witness has identified the defendant in court. See id. § 803(1.1).1, at 507. As this treatise explains:

> The trustworthiness of such hearsay declarations is established by the opportunity to cross-examine the declarant, who by definition must testify at trial. The evidence may also be more accurate than in-court testimony because the earlier identification was made while the appearance of the person identified was fresher in the declarant's memory and the in-court identification may be more suggestive than the out-of-court.

Id. § 803(1.1).1, at 506 (emphasis added).

In this case, the defendant contends that Jordan's statement to Woodall was not a prior identification for purposes of Rule 803(1.1), but rather was a mere allegation that the defendant had committed the offense. The defendant correctly observes that the vast majority of cases apply this hearsay exception where an identification has been made from a photograph display, lineup, or similar procedure. See 30B Michael H. Graham, Federal Practice and Procedure, § 7014 (Interim ed. 2000); see also Tennessee Law of Evidence, § 803(1.1).1, at 506. As one court has stated, for example, the history of the federal version of the prior identification rule reveals that Congress envisioned "lineups, show-ups, photo arrays, chance encounters, or other circumstances under which a positive identification may become uncertain by the time of trial." State v. Lopez, 943 P.2d 1052, 1055 (N.M. Ct. App. 1997) (citations omitted).

Case law and custom notwithstanding, the rule itself does not expressly limit its application to prior identifications from photographs, lineups, or other similar procedures. It simply states that there must be an identification of a person "made after perceiving the person." See Tennessee Law

of Evidence, § 803(1.1).2, at 507-08. We interpret this language to mean what it says: that the person who made the identification must have personally perceived the person identified. See e.g., id. § 803(1.1).2, at 507 ("The declarant 'perceives' by the use of the five senses."). Although this may, in a majority of cases, involve an identification by viewing a defendant in a photograph, lineup, or like procedure, we do not believe it must be limited to such cases in the absence of express limiting language in the rule. As discussed above, the rule safeguards the trustworthiness of an identification by requiring that the declarant testify at trial and be subject to cross-examination regarding the statement of identification. These safeguards in the rule are in place regardless of whether the identification is based on a photo display, lineup, or simply a statement made to another person, as in this case.

Accordingly, in applying Rule 803(1.1), it is apparent that Jordan testified he was at the scene and personally perceived the defendant shoot the victim. Moreover, Jordan testified at the trial and was subject to cross-examination regarding his statement to Woodall. Although we recognize that Jordan's participation in the crimes gave rise to the possibility that his identification of the defendant was a self-serving effort to point the finger of blame at someone other than himself, such circumstances were open to cross-examination of Jordan by the defendant. Accordingly, given that the safeguards and remaining elements of Rule 803(1.1) were satisfied, we agree with the Court of Criminal Appeals that the trial court did not abuse its discretion under the circumstances of this case.[6]

## Excited Utterance

The defendant also contends that the trial court erred in allowing Woodall to testify about Jordan's statements under the excited utterance exception in Tenn. R. Evid. 803(2). The defendant argues that Jordan's statements were made several hours after the offense and were not made while Jordan was stressed or excited. The State maintains that the trial court did not abuse its discretion in finding that the proper foundation was shown for admitting the statements pursuant to the excited utterance exception.

The hearsay rule does not exclude a statement "relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). The rationale for the admissibility of such a statement, known as an "excited utterance," is twofold:

> First, since this exception applies to statements where it is likely there
> was a lack of reflection – and potential fabrication – by a declarant
> who spontaneously exclaims a statement in response to an exciting

---

[6] We do stress, however, that no other details of an offense should be admitted under this exception to the hearsay rule inasmuch as the rule allows only the prior identification. See State v. Lopez, 943 P.2d at 1056. Thus, to the extent that Jordan's statements to Woodall contained other details of the offenses, those statements were inadmissible unless, as here, another hearsay exception was established.

event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

Tennessee Law of Evidence, § 803(2).1, at 532; see State v. Gordan, 952 S.W.2d 817, 819 (Tenn. 1997).

The first requirement is that there be a startling event or condition. As noted in Tennessee Law of Evidence, the "possibilities are endless" because "[a]ny event deemed startling is sufficient." § 803(2).2, at 533. The "event must be sufficiently startling to suspend the normal, reflective thought processes of the declarant." State v. Gordan, 952 S.W.2d at 819 (quoting McCormick on Evidence, § 297, at 854 (3d ed. 1984)). The second requirement, that the statement "relate to" the startling event or condition, is likewise broad. As stated in Tennessee Law of Evidence, the statement "may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." § 803(2).2 at 534.

The third requirement, that the statement be made while the declarant is under the stress or excitement from the event or condition, relates most directly to the underlying rationale for the exception. In State v. Smith, 857 S.W.2d 1, 9 (Tenn.1993), we said that "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." The time interval between the startling event and the declarant's statement, however, is but one consideration in determining whether a statement was made under stress or excitement:

> Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.

State v. Gordan, 952 S.W.2d at 820 (quoting Tennessee Law of Evidence, § 803(2).2, at 534).

When considering these factors in combination with the purpose of the rule, the admissibility of Jordan's statement to Woodall presents a very close question. On one hand, there is little doubt that the killing of the victim was a startling event of a serious nature and degree and that Jordan was a witness to the event. On the other hand, over twelve hours elapsed from the time of the event to the time of Jordan's statements. Moreover, the time interval is significant inasmuch as Jordan was a participant in the events and arguably had time to reflect and deliberate before making his statements to Woodall. Despite these factors, however, the trial court specifically found that Jordan was under the "stress of the traumatic events of the night before" when the statements were made.

-10-

Indeed, Woodall testified that Jordan was upset and depressed on the morning of November 9, 1995, and that Jordan was later crying and upset when he made the statements to her. Similarly, Jordan testified that he had tears in his eyes after the defendant shot the victim and that he was "depressed." Jordan testified that when he spoke to Woodall, he pictured "his life gone" and everyone "dead." Jordan said that he was still in shock, upset, crying, and depressed when he told Woodall about the offense.

As noted above, our role as a reviewing court is not to substitute our view of the admissibility of evidence for that of the trial court, but rather to determine whether the trial court's ruling constitutes an abuse of discretion. The record indicates that the trial court considered all of the relevant factors, including the passage of time, in making its ruling on what amounts to an extremely close issue. See Gross v. Greer, 773 F.2d 116 (7th Cir. 1985). Under these circumstances, we conclude that the trial court did not abuse its discretion in allowing Woodall to relate Jordan's statements.

## Admissibility of Facts Underlying Aggravating Circumstance

One of the aggravating circumstances relied upon by the State to seek the death penalty was that the defendant had a prior conviction for a felony whose statutory elements included the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1995). In the sentencing phase of the trial, the prosecution presented the testimony of Walter Bush, who was the victim of the defendant's prior violent felony of especially aggravated robbery.[7] Bush testified that on November 11, 1995, he was car-jacked by the defendant and several other men. The defendant asked if Bush would recognize him; although Bush said "no," the defendant shot him in the neck. The defendant objected at trial, and he maintains on appeal that the trial court erred in admitting the facts underlying the prior felony and then allowing the prosecutor to refer to the facts during its closing argument.[8]

In State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), we held that it is improper for the prosecutor to introduce evidence or make an argument regarding the facts and circumstances underlying a prior violent felony conviction being used to seek the death penalty where the prior conviction on its face involved violence to the person. In Bigbee, the prosecutor introduced the facts of a prior murder committed by the defendant, emphasized the character of the victim of the prior murder in its closing argument, and strongly implied that the death penalty was appropriate because the defendant had already received a life sentence for the prior murder. Id. at 811-12. We concluded that the admission of the evidence and the prosecutorial argument improperly enhanced the impact

[7] Bush was also permitted to testify at the guilt phase of the trial. We agree with the Court of Criminals' conclusion that the testimony was properly admitted at the guilt phase of the trial, and we did not order oral argument on that issue.

[8] The offense and trial occurred prior to a 1998 statutory amendment which now allows either party to introduce evidence regarding the facts and circumstances of the prior violent felony relied upon by the prosecution to establish the aggravating circumstance. See Tenn. Code Ann. § 39-13-204(c) (Supp. 1998).

of the aggravating circumstance and affected the jury's determination to the prejudice of the defendant. Id. at 812. We therefore remanded the case for a new sentencing hearing. Id.

Not every violation of the rule in Bigbee requires a re-sentencing. In State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000), for example, the prosecutor relied upon evidence underlying the defendant's prior convictions for especially aggravated robbery and attempted first degree murder to establish the prior violent felony aggravating circumstance. During the sentencing proceeding, the prosecutor showed that the prior offenses involved a shooting that occurred shortly before the first degree murder for which the defendant was on trial. Id. at 916. We concluded that the evidence was introduced to establish the defendant's identification in response to the defendant's contention that he was not involved in the prior offenses and that the prosecutor's argument was not nearly as egregious or extensive as that in Bigbee. Id. at 917. We therefore held that the evidence and argument did not affect the jury's determination to the prejudice of the defendant. Id. at 918-19.

In the present case, as in Chalmers, the prosecutor relied upon a prior violent felony, *i.e.*, especially aggravated robbery, that was committed close in time to the first degree murder being tried. The prosecution maintained that the underlying facts were introduced not to bolster the prior violent felony aggravating circumstance, but to establish another aggravating circumstance, *i.e.*, that the killing was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. See Tenn. Code Ann. § 39-13-204(i)(6) (Supp. 1995). In sum, the State theorized that because the defendant attempted to kill Bush in an effort to avoid arrest or prosecution, the evidence was probative as to the defendant's motive for killing the victim in the present case.

As the Court of Criminal Appeals observed in this case, it is apparent that the prosecutor's intent was not to unfairly increase the weight of the prior violent felony aggravating circumstance, but rather to establish an entirely separate aggravating circumstance that it was relying upon. Moreover, the prosecutor did not elaborate on or emphasize the underlying facts of the Bush offense during closing argument.[9] For these reasons, this case is remarkably similar to Chalmers and substantially different from Bigbee. Accordingly, we conclude that the evidence and argument did not affect the jury's determination to the prejudice of the defendant.

## Admissibility of Convictions During Sentencing Phase

The defendant presented numerous family members in the sentencing phase of the trial who testified about his upbringing, background, and church involvement as mitigating evidence for the

---

[9] In a related issue, the Court of Criminal Appeals observed that the argument was improper in that it used the Bush offense to contend that the defendant lacked remorse for killing the victim in this case. We agree with the intermediate court that "lack of remorse" is not a statutory aggravating circumstance; moreover, it was not proper rebuttal because the defendant did not argue his remorse as a mitigating factor. In any event, the defense failed to object to the argument, which itself consisted of a brief and non-inflammatory reference. We therefore conclude that the argument did not affect the jury's deliberation to the prejudice of the defendant.

jury's consideration. During its cross-examination of the defendant's uncle, Randall Stout, the prosecutor asked about the defendant's prior convictions for aggravated burglary, theft, reckless endangerment, and the robbery of Walter Bush. The prosecution asserted that the evidence rebutted the defense's depiction of the defendant as a "fine, active Christian" and impeached the credibility of the mitigating witnesses. The defendant argues that the trial court erred in allowing the prosecutor to use this evidence and in failing to instruct the jury that the evidence was limited to impeachment of the witness.

We begin our review of this issue with Tenn. Code Ann. § 39-13-204(c) (1991 & Supp. 1995), which governs the admissibility of evidence during a first degree murder sentencing phase:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. <u>Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence</u>; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

(Emphasis added).

We have recognized that the language of the statute reflects that the rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding. See Van Tran v. State, 6 S.W.3d 257, 271 (Tenn. 1999). We have also indicated, however, that the statute does not require a court to dispense with the evidentiary principles that are derived from and contained within the rules of evidence. See State v. Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998) (evaluating the admissibility of victim impact evidence under Tenn. R. Evid. 403).

In reconciling the application of the statute with the rules of evidence, we have recently clarified "that, in general, § 39-13-204(c) should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing." State v. Sims, ___ S.W.3d ___, ___ (Tenn. 2001). We further adopted the following principles:

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of

punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

Id. at ___.

In Sims, as in the present case, the prosecution cross-examined the defendant's mitigation witnesses with the defendant's prior convictions for theft and aggravated burglary. Id. at ___. In view of our analysis of § 39-13-204(c), we concluded that the trial court was not required to strictly follow the rules governing character evidence under the Rules of Evidence. Id. at ___; see, e.g., Tenn. R. Evid. 404, 405. We observed that the prior convictions were relevant to rebut the mitigation evidence offered by the defendant and that their probative value was not outweighed by unfair prejudice to the defendant. State v. Sims, ___ S.W.3d at ___. Although the trial court did not instruct the jury that the evidence was limited to rebuttal of the mitigating evidence and impeachment of the defense witness, we concluded that any error did not affect the jury's deliberation to the prejudice of the defendant and did not amount to reversible error. Id. at ___.

Likewise, in the present case, the trial court was not required to strictly adhere to the rules of evidence in ruling upon the prosecution's use of the defendant's prior convictions for theft, aggravated burglary, and reckless endangerment. The trial court conducted a hearing outside the presence of the jury and found that there was a factual basis for the questions asked by the prosecutor. Although it did not make specific findings, it is implicit that the trial court found that the evidence was probative in terms of rebutting the mitigation evidence offered by the defendant. As we have said, this is entirely proper under Tenn. Code Ann. § 39-13-204(c). The evidence was also probative for the purpose of impeaching the testimony of Randall Stout with regard to his opinion of the defendant's character.

Although the trial court did not give a limiting instruction on the jury's consideration of this evidence, it is clear from the record that the prosecution used the evidence to rebut the mitigating evidence and to impeach the defense witness and not to introduce evidence of a non-statutory aggravating circumstance. Accordingly, we conclude that the evidence was properly admissible under the circumstances of this case and that the failure to give a limiting instruction did not affect the jury's decision to the prejudice of the defendant.

-14-

## Exclusion of Mitigating Evidence

During the sentencing phase of the trial, the defendant sought to introduce testimony from Rico Bowers and Vassy Gandy in an effort to show that his own involvement in the offenses was minor. The defendant also sought to call Chaplain Carl Nelson to testify about gang culture and a gang's practice of blaming criminal offenses on former members.[10] The trial court excluded the evidence after finding that the defendant was attempting to re-litigate the issue of guilt. The Court of Criminal Appeals held that the evidence was admissible, but that its exclusion was harmless beyond a reasonable doubt.

The United States Supreme Court has held that the 8th and 14th amendments to the United States Constitution require that the jury in a death penalty case be permitted to consider mitigating evidence, which includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965, 57 L. Ed. 2d 973 (1978). Likewise, we have held that article I, §§ 8 and 16 of the Tennessee Constitution require that the jury not be prevented from hearing evidence about the defendant's background, record, and character, and any circumstances about the offense that may mitigate against the death penalty. See State v. Cauthern, 967 S.W.2d 726, 738 (Tenn. 1998).

In addition to the constitutional provisions, the statutory scheme in effect at the time of the defendant's offense provided:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances . . .; and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c) (Supp. 1995). In addition, the statutes specifically included as a mitigating factor that a defendant "was an accomplice in the murder committed by another person and the defendant's participation was relatively minor." Id. § 39-13-204(j)(5) (Supp. 1995).

---

[10] The defendant also sought to admit testimony from Randall Stout regarding why the defendant had tattoos, but the trial court sustained the prosecution's objection that the evidence was hearsay. As we have indicated, the Rules of Evidence do not govern the admissibility of evidence under Tenn. Code Ann. § 39-13-204(c). We are unable to review the effect of any potential error, however, inasmuch as the defendant did not make an offer of proof.

Given these controlling principles, we conclude that the trial court erred in simply determining that the proposed mitigating evidence was inadmissible. In short, the defendant's theory was that the evidence may have demonstrated that he played a minor role in the offenses, which may have not only established a mitigating factor, but also rebutted the felony murder aggravating circumstance, which requires a defendant to have played a "substantial role." Thus, evidence supporting this theory was admissible.

The problem with the defendant's theory, however, is that Bowers and Gandy, like the accomplices who testified during the guilt phase, inculpated the defendant as the one who led the offenses and shot the victim. Moreover, the defense made no proffer indicating that the testimony of Bowers or Gandy would differ from these statements. Bowers in particular was unlikely to have testified that he shot the victim as alleged by the defendant. Indeed, in the absence of a proffer, the defendant simply contends that Bowers and Gandy would have had to be impeached with their prior statements, further rendering the proposed mitigating evidence of dubious value.

Likewise, the testimony of an expert on gang culture, who did not know the defendant or any of the gang members, would have conflicted with the defendant's statement to police in which he admitted being a member of the gangster disciples. Moreover, there was other evidence regarding the defendant's theory that he was falsely accused by gang members because he was a former member, and it was obviously rejected by the jury.

Accordingly, we agree with the Court of Criminal Appeals' conclusion that the exclusion of the mitigating evidence did not affect the jury's decision to the prejudice of the defendant and was shown to be harmless beyond a reasonable doubt. See State v. Cauthern, 967 S.W.2d at 738-39.


## Application of Felony Murder Aggravating Circumstance

Although not challenged by the defendant, the Court of Criminal Appeals held that the felony murder aggravating circumstance set forth in Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 1995) was properly applied by the jury even though the defendant was convicted of felony murder. We have elected to address this issue as well, and we agree with the Court of Criminal Appeals.

In State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), this Court addressed the application of the felony murder aggravating circumstance to seek the death penalty for the offense of felony murder.[11] We said that an aggravating circumstance must provide "a principled way to distinguish

---

[11]     Prior to July 1, 1995, felony murder was "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate[,] any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." See Tenn. Code Ann. § 39-13-202(a)(2) (1991). At that time, the felony murder aggravating circumstance was applicable when "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice
(continued...)

the case in which the death penalty was imposed from the many cases in which it was not . . . and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed." Id. at 343 (citations omitted). We reasoned that because the elements of the felony murder aggravating circumstance mirrored the elements of the offense of felony murder, its application failed to achieve this narrowing of death-eligible offenders and therefore violated article I, § 16 of the Tennessee Constitution. Id. at 346.

Under present law, however, which became effective July 1, 1995, felony murder occurs when one is killed in the perpetration of any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, or aircraft piracy. Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1995). In contrast, the present felony murder aggravating circumstance, which became effective on May 30, 1995, provides that it applies where the murder:

> was <u>knowingly</u> committed, solicited, directed, or aided by the defendant, while the defendant had a <u>substantial role</u> in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

Id. § 39-13-204(i)(7) (Supp. 1995) (emphasis added).

Unlike the statutes analyzed in <u>Middlebrooks</u>, the present versions of felony murder and the felony murder aggravating circumstance do not duplicate the elements of one another. The aggravating circumstance applies only where the jury finds that a defendant acted *knowingly* and had *a substantial role* in the offense. The additional elements were not in the prior version of the felony murder aggravating circumstance. In short, the present statutory scheme eliminates the duplication that was at issue in <u>Middlebrooks</u> and thus achieves the constitutionally required narrowing of death-eligible offenders convicted of felony murder. We therefore hold that the jury's application of Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 1995) was constitutionally proper and appropriate under the facts of this case.

## **Proportionality**

---

[11](...continued)
in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb." Id. § 39-13-204(i)(7) (1991).

Where a defendant has been sentenced to death, we must undertake a comparative proportionality review pursuant to Tenn. Code Ann. § 39-13-206(c)(1) (1997). The analysis is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. Id. at 668; see also State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998).

This Court has consistently employed the precedent-seeking method of comparative proportionality review, which compares a case with cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Id. at 667. We also consider multiple factors about the defendant: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id. Since no two defendants and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. See id. at 668.

In reviewing the facts and circumstances of the offense, the evidence shows that the defendant and three accomplices were driving around when the defendant saw the victim in her car and said, "I'm going to get that whore." The four men followed the victim for five or ten minutes and then pulled behind her when she stopped her car. The defendant accosted the victim, grabbed her by her hair, held a gun to her stomach, and forced her into the backseat of her car with Quentin Jordan. The defendant told the victim that she was "with the devil" and that he would have to kill her because she could recognize him. When they got out of the car, the defendant hugged the victim and then fired a single shot into her head. The defendant and Jordan removed items from the victim's car, wiped off their fingerprints, and fled from the scene, leaving the victim for dead. The victim never regained consciousness and died approximately two days later. The defendant initially denied any knowledge of the events before giving a statement that implicated another as the shooter.

In reviewing the record with regard to the defendant, the evidence showed that the defendant, an African-American male, was 20 years of age at the time of these offenses. The defendant had a prior conviction for the violent felony of especially aggravated robbery during which he shot an unarmed victim; the offense occurred just days after the defendant killed the victim in this case. The defendant presented numerous witnesses in mitigation who testified about his upbringing and background. Although abandoned by his mother as an infant, the defendant was raised by his grandmother in a supportive and loving family environment that encouraged his involvement in church activities. The defense witnesses indicated that the defendant had again turned to religion and could be rehabilitated if spared from the death penalty.

-18-

As the State asserts on appeal, this Court has upheld the death penalty in many cases bearing similarities to this one. In the following cases, for example, the victims were shot in the course of a robbery or kidnapping. State v. Chalmers, 28 S.W.3d at 919; State v. Smith, 993 S.W.2d 6 (Tenn. 1999); State v. Burns, 979 S.W.2d 276 (Tenn. 1998); State v. Howell, 868 S.W.2d 238 (Tenn. 1993); State v. Evans, 838 S.W.2d 185 (Tenn. 1992); State v. Bates, 804 S.W.2d 868 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. King, 718 S.W.2d 241 (Tenn. 1986). In many of these cases, like the present case, the victim was selected at random.

Similarly, the Court has repeatedly upheld death sentences in which the prior violent felony aggravating circumstance was applied by the jury. See State v. Chalmers, 28 S.W.2d at 919; State v. Smith, 993 S.W.2d at 18; State v. Cribbs, 967 S.W.2d at 776; State v. Howell, 868 S.W.2d at 262; State v. King, 718 S.W.2d at 248, among others. The Court has likewise upheld death sentences in which one of the aggravating circumstances was that the killing was committed to avoid arrest or prosecution. See State v. Bush, 942 S.W.2d 489, 504 (Tenn. 1997); State v. Smith, 857 S.W.2d 1, 14 (Tenn. 1993); State v. Evans, 838 S.W.2d at 188; State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989), among others. Finally, as we have said, the application of the felony murder aggravating circumstance was appropriate under present law even though the defendant was convicted of felony murder.

In considering characteristics regarding this defendant, it appears that we have upheld the death sentence in several cases where the defendant was roughly the same age as the defendant or had presented similar mitigating evidence. See State v. Burns, 979 S.W.2d at 283; State v. Pike, 978 S.W.2d 904, 919 (Tenn. 1998); State v. Cauthern, 967 S.W.2d at 740-41; State v. Hall, 958 S.W.2d 679, 700 (Tenn. 1997); State v. Bland, 958 S.W.2d at 670; State v. Van Tran, 864 S.W.2d 465, 482 (Tenn. 1993). In sum, our review requires a determination of whether a case plainly lacks circumstances found in similar cases where the death penalty has been imposed. See State v. Burns, 979 S.W.2d at 285. The similarity of the facts and circumstances of this case to numerous cases in which the death penalty has been upheld reveals that the death sentence is not arbitrary or disproportionate as applied in this case.

The dissent asserts that the majority's comparative proportionality analysis is flawed in that it fails to assure that a disproportionate sentence of death will be set aside. A majority of the Court has already addressed and rejected the views of the dissent and has consistently adhered to the proportionality analysis carefully detailed in Bland. See State v. Keen, 31 S.W.3d 196, 223-24 (Tenn. 2000). Moreover, the dissent in no way asserts or establishes that the sentence of death is either arbitrary or disproportionate as applied in this case to this defendant.

**Conclusion**

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the evidence supports the jury's finding of the statutory aggravating circumstances; that the evidence supports the jury's finding that

the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt; and that the sentence is not arbitrary, excessive, or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge John Peay and joined in by Judge Norma McGee Ogle and Judge Alan E. Glenn. The relevant portions of that opinion are attached as an appendix to this opinion. The defendant's sentence of death is affirmed and shall be carried out on the 25th day of September, 2001, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of appeal are taxed to the State.

_____
RILEY ANDERSON, CHIEF JUSTICE