IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 26, 2023

## STATE OF TENNESSEE v. TAMARION TERRELL JOHNSON

**Appeal from the Criminal Court for Hamilton County**
**No. 307589   Don W. Poole, Judge**

_____

### No. E2022-01308-CCA-R3-CD

_____

A Hamilton County jury convicted Defendant, Tamarion Terrell Johnson, of second degree murder and aggravated assault in the shooting death of the victim, Shawnquell Stanfield. The trial court merged the assault conviction into the murder conviction. Defendant argues on appeal that the trial court improperly instructed the jury on flight and that the evidence was insufficient to support his second degree murder conviction. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Tamarion Terrell Johnson.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and AnCharlene Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

The testimony at trial established that the victim, also known as "Phat Baby," was 19 years old and lived with her grandmother in east Chattanooga. On the evening of September 24, 2018, the victim was drinking beer and smoking marijuana in her grandmother's driveway with Mista McCary, Devrin Houston, and Ladarean Lane. At one point that evening, the victim got in the back driver-side seat of a white Ford Fusion driven

by Defendant to sell him drugs. The victim sold marijuana and Xanax in Chattanooga. Mr. McCary did not see anyone besides Defendant in the car. Defendant and the victim drove off in the Fusion. This concerned Mr. McCary, Mr. Houston, and Mr. Lane. Mr. McCary believed that the victim would get in the car, exchange the drugs and money, and get out. They decided to follow Defendant and the victim. While the three were following Defendant's vehicle, Defendant stopped on North Chamberlain Avenue. The victim came out and admonished the three for "messing up her money." The victim told them to meet her at her grandmother's house, and she got back in Defendant's car. Mr. McCary testified at trial that the victim had a backpack that she left in the car with Mr. McCary and the others. Neither the victim, Mr. McCary, Mr. Houston, nor Mr. Lane had a weapon that evening.

Mr. McCary and company returned to the victim's grandmother's house and became worried because they could not get in contact with the victim. Mr. McCary called the victim's cell phone several times to no avail. Mr. McCary, Mr. Houston, and Mr. Lane got back in their vehicle and returned to the location where the victim had admonished them. When they arrived, they saw only police lights. Mr. McCary tried to approach the scene but was blocked from doing so by police officers.

Amanda King lived in a home on North Chamberlain Avenue in east Chattanooga with her then-boyfriend, her children (one of whom was Romonia "Jade" Sharp), and one of Ms. Sharp's friends, Erica Forte. Defendant had lived with them for a short period at some point prior but did not live with them on September 24, 2018. Everyone in the house was in bed early that evening because of the heavy rain. Ms. King testified at trial that she heard "roughly six" gunshots "right in [her] window" "around 8[:00 or] 8:15" that evening. Ms. King crawled upstairs to check on her children, whom she told to "stay down" and tried to console—the children were understandably scared by the gunshots. Ms. King testified that she called 911 ten or fifteen minutes after she heard the gunshots. She did not go outside until the police arrived. Ms. King spoke with the police about what happened and gave them Ms. Sharp's and Ms. Forte's cell phones. Ms. King testified at trial that Ms. Sharp had previously been in a romantic relationship with Defendant. She identified Defendant in the courtroom.

Ms. Sharp was friends with the victim and was one of the victim's customers. Ms. Sharp had introduced the victim and Defendant. Ms. Sharp and Defendant were in a romantic relationship around the same time the victim was killed. Ms. Sharp was upstairs in the North Chamberlain Avenue home when she heard the gunshots. She was not initially concerned about them but noticed that they were close enough to "sh[ake] up the house." Ms. Sharp did not go outside until the police arrived. When Ms. Sharp and Ms. Forte saw the victim lying in the road, they did not initially recognize her. However, they realized it was the victim when police found one of the victim's shoes. Ms. Sharp recognized the

shoe as one the victim had worn that day. Ms. Sharp and Ms. Forte had bought marijuana from the victim earlier that afternoon. After Ms. Sharp realized the victim was dead, she made a post on Facebook that said, "Check on your people." Mr. McCary and Mr. Houston called her when they saw the post. They gave Ms. Sharp information that she relayed to police.

Chattanooga Police Department ("CPD") Sergeant Jason Wood responded to a shots fired call at North Chamberlain Avenue in Chattanooga on September 24, 2018, just prior to 10:00 p.m. Sergeant Wood recalled at trial that it was raining "exceptionally hard" that evening. When Sergeant Wood arrived at the scene he began looking for evidence of a crime. He spoke with a woman who told him that the shots sounded like they came from "just outside her house." As he continued to search in the rain, he "almost stepped on an individual" lying in the road. It was the victim. Sergeant Wood looked for signs of life and called for an ambulance. Emergency medical personnel took the victim to Erlanger Hospital, where she died later that evening. Sergeant Wood taped off the area to preserve evidence, though the area was later expanded when police found the wrecked Ford Fusion nearby.

Crime scene investigators arrived at the scene and began to take photographs and collect evidence. They collected a shoe as well as swabs from suspected blood in the area where the victim was found. Investigators also photographed the white Ford Fusion that was wrecked up the hill from where the victim's body was found. In the frame of the rear passenger window they found a shell casing. Investigators also recovered a bag of marijuana that had washed down the street due to the heavy rain. When Defendant was processed at the police station, investigators swabbed his hands for gunshot residue ("GSR") and collected a buccal swab.

CPD Sergeant Joseph Neighbors was a homicide detective in September 2018. On September 24, 2018, Sergeant Neighbors went to Erlanger Hospital, where the victim had been transported. When he arrived at the hospital, he learned that the victim had died. He drove to the North Chamberlain Avenue scene. Sergeant Neighbors spoke with Ms. Sharp, Ms. King, and Ms. Forte, and collected Ms. Sharp's and Ms. Forte's cell phones.

CPD Officer Veronica Thomas was en route to the North Chamberlain Avenue location when she was rerouted to a home on Searle Street in east Chattanooga. Officer Thomas spoke with the residents, went into the home, and found Defendant in a bathroom. Officer Thomas recalled at trial that Defendant seemed "shy" and "nervous." Officer Thomas took Defendant to the police station not as a suspect, but as a witness. She was unaware of Defendant's involvement in the shooting and believed his hiding in the house was connected to a separate incident.

After speaking with witnesses at the North Chamberlain Avenue scene, Sergeant Neighbors returned to the police station to interview Defendant, who had been identified by that point as a person of interest in the case. Defendant's mother was with Defendant at the police station and gave Sergeant Neighbors consent to interview Defendant. Defendant's mother left and Defendant waived his *Miranda* rights. A video recording of Sergeant Neighbors' interview with Defendant was admitted as an exhibit at trial.

Defendant gave varying accounts of the events in his interview with Sergeant Neighbors. Defendant told Sergeant Neighbors first that he was going to buy Xanax and marijuana from the victim—he eventually said that he planned to rob the victim. Defendant initially said he was a passenger in the vehicle and someone else drove—he later changed his story and said he was alone, explaining that he was "covering for [himself]" earlier. Defendant also stated that the people following him brandished weapons and shot at him— then he said that he started shooting before he was shot at. Defendant also told Sergeant Neighbors that he ran through the woods to another house and told the residents that he was being chased and asked them to call the police.

Defendant became increasingly agitated throughout the interview. He eventually said, "[i]t was my gun, I shot, I killed, f[***] it." Defendant's demeanor was much calmer after he said this. Defendant said several times that he "busted" the victim, which Sergeant Neighbors explained at trial means he "shot her." Defendant said, "I did that s[***]. I was by myself. Keep it real." Defendant told Sergeant Neighbors that he had stolen the car he was driving when he shot the victim.

Defendant boasted to another detective during the interview about the shooting, asking, "S[***] was lit, wasn't it?" Sergeant Neighbors explained at trial that "lit" means "awesome." When the detective asked Defendant if he was proud of what he had done, Defendant said, "Straight up."

Defendant finally gave a written statement in which he wrote that "we" ("I" was crossed out) planned to rob the victim, became nervous when the others were following, and shot the victim because the individuals in the other vehicle "had guns."

When the wrecked Ford Fusion was searched the next day, investigators found another .45 caliber shell casing in the seat belt receiver in the back seat. In the rear passenger floorboard they found a white pill later determined to be Xanax. Investigators swabbed different parts of the vehicle's interior for DNA and GSR. They found part of a fingernail in the front passenger floorboard.

On October 1, 2018, Ms. King received a letter from Defendant addressed to Ms. Sharp. The letter was admitted as an exhibit at trial. Defendant wrote, in relevant part:

- 4 -

Dear [Ms. Sharp],

I am sorry for killing [Ph]at baby. I really ain't [sic] mean to. All she had to do was give everything up but she didn't. She ran and tried to go get a strap so I laid her down. . . . I love you baby and tell yo [sic] momma and sisters everything on here. Especially about dem [sic] f[***] n[*****]s.

From: Tamarion aka (True 7)

I ain't [sic] never fall Imma [sic] be home baby

ON GOD

Ms. King later received another letter from Defendant addressed to Ms. Sharp in which he expressed his love for Ms. Sharp and denied killing the victim, instead writing that he was "just around."

Ms. Sharp testified at trial that she had seen the first letter but had not seen the second until she was shown it at trial. She recognized the handwriting in both letters as Defendant's and "True 7" as Defendant's nickname. Ms. Sharp also testified that a "strap" is a gun.

DNA testing of the swab taken from the Fusion's steering wheel revealed two profiles: a major profile and a minor profile. When compared with Defendant's DNA obtained from the buccal swab, Defendant was excluded as the major profile contributor. The minor profile was too small to produce any results. Special Agent Carrie Schmittgen, a forensic biologist for the Tennessee Bureau of Investigation ("TBI"), testified at trial that it was possible that the major DNA profile came from the vehicle's owner. Police never obtained the owner's DNA. DNA comparison revealed that the fingernail did not come from the victim.

GSR testing of the swabs taken from Defendant's hands showed no GSR on his hands. The swabs were taken about four hours after the homicide. Agent Russell Davis, a microanalyst for the TBI, noted that Defendant stated he went swimming before the swabs were taken. Agent Davis testified that anything that removes oil from a person's hands, such as swimming, heavy rain, or strenuous activity such as running, could remove GSR from one's hands. The swabs from Defendant's hands were tested a second time, and the result was the same. Agent Davis also tested swabs that came from the interior of the Fusion, which showed GSR in the rear driver and passenger sides.

Agent Alex Brodhag, a firearm examiner for the TBI, examined the two spent .45 caliber shell casings found in the Fusion. He found several similarities in the markings on the two shell casings, but could not conclusively state that the two shell casings were fired from the same weapon. Based on other markings, though, Agent Brodhag concluded that both bullets were loaded in the same chamber. Agent Brodhag did not test a firearm because no firearm was found in this case.

The medical examiner determined that the victim's cause of death was multiple gunshot wounds and her manner of death was homicide. The victim was shot three times: once in her chest, once in her pelvic area, and once in her elbow. According to the medical examiner, the nature of the victim's wounds was consistent with someone running away from someone who was shooting at them. A toxicology report conducted using the victim's blood revealed that she had used marijuana and had drunk alcohol sometime recently before she was killed.

After proper inquiry with counsel, Defendant elected not to testify. Defendant did not put on proof at trial.

The jury convicted Defendant of second degree murder and aggravated assault. The trial court merged the aggravated assault conviction into the murder conviction. After a sentencing hearing, the trial court imposed an effective sentence of 21 years in the Tennessee Department of Correction at 100% service rate. *See* T.C.A. § 40-35-501(i)(1), (2)(B). Defendant timely appeals.

### *Analysis*

#### *Flight Instruction*

Defendant argues that the trial court erred in instructing the jury on flight as an inference of guilt because the proof did not warrant the instruction. The State counters that the proof fairly raised the instruction, and even if the trial court erred, such error was harmless given the State's formidable proof. We conclude that the proof fairly raised the flight instruction and the trial court properly instructed the jury.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016).

To properly charge the jury on flight as an inference of guilt, sufficient evidence must exist to support the instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004) (appendix). There is sufficient evidence to support a flight instruction where proof exists of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or leaving the community for parts unknown." *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (citation omitted). Flight or attempted flight may bear on the defendant's intent, purpose, or consciousness of guilt and may connect the defendant with the commission of the offense. *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970). "'The law makes no nice or refined distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction.'" *Dorantes*, 331 S.W.3d at 380 n.16 (quoting *Rogers*, 455 S.W.2d at 187). "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

The trial court instructed the jury on flight as follows:

The flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open or it may be a hurried or concealed departure, or it may be concealment within the jurisdiction. However, it takes both a leaving the scene and a hiding out, evasion, or concealment in the community or leaving of the community for parts unknown to constitute flight. If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime charged, the crime alleged. However, since flight by defendant may be caused by consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

- 7 -

We conclude that the proof fairly raised the flight issue and the trial court properly instructed the jury. The proof showed that Defendant left the victim for dead on North Chamberlain Avenue after he shot her and drove away. He did not make it far, though, before he wrecked his car in the woods. Defendant left the car and ran on foot to a nearby house where he hid in the bathroom until law enforcement found him. Moreover, the trial court's instructions properly relayed the applicable law to the jury. Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant argues on appeal that the evidence was insufficient to support his second degree murder conviction. The State argues that the evidence was sufficient. We agree with the State.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 79. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of second degree murder, which as relevant here, is "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). "Knowing" is defined under Tennessee law as:

[A] person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-302(b).

The evidence here, viewed in a light most favorable to the State, shows that the victim got into Defendant's car to sell him drugs. Defendant planned to rob the victim of her drugs and brought a loaded gun to accomplish the robbery. When the victim tried to run away, Defendant shot her three times as she ran. Defendant left the victim for dead in the pouring rain and attempted to drive away in a stolen car, but crashed it in some nearby woods. Defendant fled the scene and hid in a nearby house, telling the residents he was being chased. The victim died that evening from her injuries. When questioned about the shooting, Defendant ultimately confessed to the shooting, going so far as to boast about what he had done. Defendant asked a detective if he thought what he had done was "lit," or awesome. Defendant admitted as much again in his letter to Ms. Sharp, writing that "[s]he ran . . . so I laid her down."

Defendant complains that the inferences raised by the proof should have been resolved in his favor and that minor discrepancies in some of the witnesses' testimony rise to the level of insufficiency. We remind Defendant that at this stage the State is entitled to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom," *Elkins*, 102 S.W.3d at 581, and that the jury's verdict resolved all conflicts in the testimony in the State's favor. *See Harris*, 839 S.W.2d at 75.

Based on the proof presented at trial, we conclude that a rational jury could find that Defendant knowingly killed the victim. Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE